J-A33025-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| BRUCE J. GOLDBLATT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| JANE D. YOUNG | |
| Appellant | No. 692 WDA 2016 |

Appeal from the Decree Entered April 19, 2016
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2010-3177

| | |
|---|---|
| BRUCE J. GOLDBLATT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| JANE D. YOUNG | |
| Appellee | No. 741 WDA 2016 |

Appeal from the Decree Entered April 19, 2016
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2010-3177

BEFORE:   LAZARUS, J., SOLANO, J., and STRASSBURGER, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED JULY 31, 2017**

Bruce J. Goldblatt ("Husband") and Jane D. Young ("Wife"), each appeal from a decree of divorce.  The parties raise numerous issues regarding the court's disposition of their economic claims.  We affirm the

---

[*] Retired Senior Judge assigned to the Superior Court.

decree granting the parties' divorce; affirm in part, reverse in part, and vacate in part the trial court's April 14, 2016 order determining equitable distribution as set forth below; and remand for further proceedings.

The parties were together in marriage for 3½ years, but their divorce proceedings have lasted more than twice that long. Their legal saga began when the parties married in 2006 and executed a prenuptial agreement that is at the heart of much of their dispute. The trial court provided the following description of the proceedings below:

> The parties, Bruce Goldblatt ("[H]usband," age 62 at the time of trial), and Jane Young ("[W]ife," age 58 at the time of trial), married on October 24, 2006. For each, this was their second marriage and no children were born therefrom. They separated on April 2, 2010 when [H]usband left the marital residence. Husband filed a divorce complaint on April 28, 2010 in the Washington County Court of Common Pleas. The complaint contained just one count, which was for a divorce from [W]ife. On May 14, 2010, [W]ife filed an answer and counterclaim, which included requests for alimony *pendente lite* ("A.P.L."),[1] alimony, equitable distribution of marital property, enforcement of a prenuptial agreement,[2] and injunctive relief. The Court held a four-day trial on the issues starting on February 23, 2016.
>
> There has been protracted litigation regarding these divorce claims as well as claims ancillary to the divorce. Throughout the proceedings, there have been voluminous petitions for contempt of court orders and for the enforcement of discovery requests. Most of these contempt and enforcement proceedings were the

---

[1] Alimony *pendente lite* is "temporary support granted to a spouse during the pendency of a divorce or annulment proceeding." 23 Pa.C.S. § 3103.

[2] The parties signed an "Amended Prenuptial Agreement" on December 15, 2006, almost two months after their marriage, and it is that amended agreement that is at issue in this case.

result of [H]usband's behavior or failure to comply with the payment of support or discovery requests. Accordingly, [W]ife incurred attorney fees to enforce the Court's orders and her claims were stalled as a result of [H]usband's contemptuous behavior. Specifically, ten court orders were issued against [H]usband for failing to comply with discovery matters. As a result, [W]ife had been awarded $30,981.89 in counsel fees through February 23, 2016 due to [H]usband's failure to comply with discovery requests or to pay support as ordered.[3]

Trial Ct. Op., 4/14/16, at 1-2 (some footnotes and citations omitted).

On May 19, 2010,[4] Wife filed a petition to enforce a portion of Paragraph 3(c) of the prenuptial agreement, which reads:

Following the marriage, both parties shall contribute their entire net income to a joint account or accounts, to be utilized for household and living expenses of the parties during the term of the marriage, and as the source of payment for mortgage payments, property taxes and all other expenses of the marital residence. The parties acknowledge that their contributions to this account or accounts shall not be equal.

R.R. at 1059a.[5] This paragraph — and, in particular, its two facially inconsistent clauses, "Following the marriage" and "during the term of the marriage" — has been a major source of the protracted controversy between the parties. Another provision of the agreement, Paragraph 4, deals with Wife's right to support and maintenance after the parties' divorce or

---

[3] As discussed below, the orders sanctioning Husband were based on an interpretation of his obligations under the Prenuptial Agreement that was overturned later in the litigation. The latter decision reversed the order forming the basis for those sanctions.

[4] The dates referenced in this decision are the docketing dates.

[5] We cite to the reproduced record for the parties' convenience.

separation, and the relation of Paragraph 4 to Paragraph 3(c) has been a component of the dispute. Much of the disagreement below resulted from an early interpretation of paragraph 3(c) by Judge DiSalle that placed substantial financial burdens on Husband and that was later rescinded when another judge, Judge Gilman, took over the case.

The court, in an interim order by Judge DiSalle, granted Wife's petition to enforce Paragraph 3(c) on the same day that Wife filed it, May 19, 2010. Interpreting the agreement, Judge DiSalle ordered that, even though the parties had separated, Husband had to deposit his entire paycheck — 100% of his income — into the parties' joint checking account for use by Wife to pay all household and joint living expenses pending a hearing scheduled for September 24, 2010. Order, 5/19/10.

On August 17, 2010, Wife filed a petition to enforce compliance with the court's May 19, 2010 order. The court again granted Wife's petition that same day and ordered Husband to, among other things, comply with the May 19, 2010 order, retroactive to May 19th. On September 24, 2010, Judge DiSalle held a hearing on Wife's original May 19, 2010 enforcement petition, but did not immediately issue an order. At the hearing, both Husband and Wife testified; Husband's counsel opined that Paragraph 3 of the prenuptial agreement was ambiguous, and Wife's counsel disagreed.

On October 8, 2010, Wife filed a third petition to enforce, which claimed Husband failed to comply with the court's May 19 and August 17,

2010 orders. The court again granted the petition that same day, and ordered Husband to make all payments owed to Wife within three business days.

On October 21, 2010, Judge DiSalle issued an order granting Wife's original May 19, 2010 petition to enforce. He held that Husband was obligated under Paragraph 3(c) to, among other things, deposit his entire paycheck into the parties' joint account and "not make any withdrawals or transaction[s] from the account absent an agreement by the parties." Order, 10/21/10.

We state the subsequent procedural history as set forth by the trial court:

Two weeks later on November 1, 2010, [H]usband filed a Chapter 13 bankruptcy petition, which [W]ife did not join.

The U.S. Bankruptcy Court dismissed [H]usband's petition because it had no merit. Husband, thereafter, filed a second Chapter 13 bankruptcy petition on December 15, 2010 that [W]ife did not join. The proceeding was converted to a Chapter 11 proceeding. Again, the U.S. Bankruptcy Court dismissed the petition because it had no merit. All divorce proceedings were halted for four months due to the automatic stays in place pending dismissal of husband's bankruptcy cases. Husband explained that filing the bankruptcies was at "the advice of counsel," but did not elaborate. This [c]ourt believes the bankruptcy petitions were filed, in part, to relieve [H]usband's financial obligation that Judge DiSalle had imposed upon him.

Another reason for the delay in the divorce proceedings concerned a residence located on Dyers Stone Drive in Nottingham Township, Washington County. When the parties married, [H]usband sold his home and moved into [W]ife's premarital residence located on Arrowhead Lane, Eighty Four, Pennsylvania. According to the prenuptial agreement, however,

[W]ife was to sell her Arrowhead Lane residence and use those proceeds to purchase a marital residence for the parties. The new home was to be titled in her name only, and any appreciation in value was to remain [W]ife's separate property.[6] Wife contracted with Custom Homes following the marriage to construct the new home on Dyers Stone Drive. During the construction process, the parties noticed that the walls were cracking and that drywall nails were popping from the drywall.[7] These problems led to . . . two lawsuits. [The first of these resulted from a decision by Husband and Wife to fire Custom Homes, resulting in an action by the builder for breach of contract. Custom Homes won an arbitration judgment of

---

[6] The property was purchased with a $623,200 mortgage. Joint Ex. 1 at ¶ 19 (parties' joint stipulations). One of the disputed issues in this appeal is whether the parties should share responsibility for that mortgage debt even though the home is Wife's property.

[7] The court further explained:

As [W]ife testified, the home was about two-thirds complete when the builder was fired. The parties stipulated that the cost to stabilize the subsidence and to make the necessary repairs to the home would be between $425,000 and $475,000. Further, the cost to then complete the house would be between $300,000 and $350,000. Based upon same, the total estimated cost of complete remediation is between $725,000 and $825,000. Therefore, this "leaves Dyers Stone with a fair market value 'as is' of between [negative] $100,000 and [negative] $200,000,["] without considering the expenditure of $104,904.55 in counsel fees thus far.[]

Trial Ct. Op., 4/14/16, at 3 n.6. The parties stipulated that if the home "was a completed structure ready for habitation, [it would have] a fair market value of $625,000." Joint Ex. 1 at ¶ 21. But because the cost to repair and complete the home would cost between $725,000 and $825,000, the marital home has, at best, a negative value of $100,000. The parties also stipulated that the value of the unimproved lot was $45,000, the estimated cost to demolish the half-constructed home would be $75,000, and thus a post-demolish lot would have a fair market value of negative $30,000. **Id.** at ¶ 23.

$64,032.21 against Husband and Wife, jointly and severally.[8]] Believing that [the other lawsuit], the Codesys lawsuit, should be litigated before the divorce trial, [W]ife filed requests to continue the scheduling of the trial four separate times. Eventually, this [c]ourt would not grant any further continuances. In addition, [W]ife caused some delay in the divorce proceedings for failing to comply with [H]usband's discovery request. The [c]ourt sanctioned [W]ife three times.

On May 1, 2010, [W]ife filed a complaint against Codesys in Allegheny County with respect to the Dyers Stone Drive property. Codesys was the company hired to perform "inspections on the Property during the course of the project." Wife alleged that Codesys "failed to review the Property and permitted construction to move forward despite a defective foundation." *See Jane Young v. Codesys*, GD-12-5436 (Complaint, ¶¶ 20, 21). After many continuances, the Court of Common Pleas has set the trial for the first week of September 2016. Wife has also sued her counsel who represented her in the case that she defended against Custom Homes. *See Jane Young v. John Lippl*, GD-12-19194.

Trial Ct. Op., 4/14/16, at 1-4 (some footnotes and citations omitted).

Meanwhile, Wife continued to file a flurry of motions seeking relief for Husband's failure to comply with the court's prior orders instructing him to deposit his entire paycheck into the parties' joint account:

• On April 28, 2011, Wife filed a petition to prevent Husband from withdrawing money from his retirement account.[9] The court granted Wife's petition and, on May 25, 2011, entered an order that Husband could

---

[8] Husband and Wife disputed whose decision it was to fire Custom Homes. Husband claims Wife controlled the litigation strategy in the case.

[9] The retirement account was Husband's only asset subject to marital distribution.

withdraw up to $50,000 from his retirement account over three months, which would then be transferred to Wife; the order stated that the account would be frozen after Husband withdrew $50,000. Order, 5/25/11.

- On May 26, 2011, the court held Husband in contempt for failing to pay amounts required under the court's prior orders. Among other things, the court ordered Husband to pay 50% of his paycheck or unemployment compensation[10] directly to Wife. Order, 5/26/11.

- On June 22, 2011, the court granted Wife's petition for counsel fees. The court's order (which included the court's handwritten interlineations) stated: "Plaintiff, Bruce J. Goldblatt['s] obligation to pay the sum of $50,000.00 and other sums as counsel fees for the vexatious behavior and otherwise shall be considered by the Divorce Master." Order, 6/22/11.

- On July 14, 2011, on Wife's motion for reconsideration of the May 26, 2011 order instructing Husband to pay 50% (rather than 100%) of his wages or unemployment income to Wife,[11] the court ordered Husband to provide an accounting of his income and expenses since May 1, 2010. The order also stated that Wife's claim for legal fees associated with enforcing

---

[10] Husband was notified in April of 2011, that he would be laid off from his job on June 30, 2011.

[11] Husband did not challenge the timeliness of Wife's motion for reconsideration.

Husband's obligation under the prenuptial agreement "shall be preserved for equitable distribution." Order, 7/14/11.

• On July 21, 2011, on another of Wife's petitions for contempt, the court again ordered Husband to, among other things, pay Wife 50% of his net pay.

Eventually, on August 3, 2012, Judge DiSalle granted Wife's petition for special relief and ordered Husband to, among other items, reimburse Wife for the household and living expenses she incurred following the parties' separation. The order also stated that all future "issues regarding compliance with this and prior Orders of Court and compliance with discovery matters shall be heard by" Judge Gilman, who was the presiding family court judge at that time. Order, 8/3/12.

On October 25, 2012, in response to a petition filed by Wife on August 16, 2012, the court found Husband in contempt and instructed that Husband could purge the contempt by, among other items, paying 50% of his net paycheck and any unemployment compensation to Wife. Order, 10/25/12. Later (the record is unclear regarding the date), the parties' counsel appeared in court and advised Judge Gilman that Husband failed to comply with that October 25, 2012 order. On December 10, 2012, the court found Husband in contempt of its August 3 and October 25, 2012 orders, but declined to imprison him. On December 28, 2012, Wife filed a petition for reconsideration of the court's decision to not incarcerate Husband, which the

court granted that same day. The court ordered Husband to report to county jail on January 7, 2013, and stated that Husband would be incarcerated until such time as he complied with the court's orders and purged his contempt, but in no event would he be held in jail for more than one month.

On January 4, 2013, Husband filed an omnibus motion for reconsideration that raised multiple issues. In pertinent part, Husband asked the court to reconsider its December 28, 2012 order instructing him to report to jail. The motion raised a litany of arguments, including that the court's underlying orders (which, as discussed, formed the bases for the court's December 28, 2012 order instructing Husband to report to jail) lacked any basis in the Rules of Civil Procedure governing an award of support. Husband also requested the court to (1) certify for appeal the court's August 3, 2012 reimbursement order, which was interlocutory; (2) stay the proceedings; and (3) impose house arrest or work release in lieu of incarceration. In a supporting brief, Husband explained his contention that all of the orders compelling him to pay either 100% or 50% of his paycheck pursuant to Paragraph 3(c) of the parties' prenuptial agreement flowed from Judge DiSalle's flawed interpretation of that provision, and he asked Judge Gilman to depart from that interpretation:

> Judge DiSalle apparently decided that [Husband] had to continue to deposit his income into a joint account pursuant to paragraph 3 of the prenuptial agreement, but there is no such determination of record. This can only be inferred because

- 10 -

Judge DiSalle repeatedly ordered [Husband] to deposit 100% of income into a joint account. It is not clear why since the Agreement qualified the deposit with the phrase "during the term of the marriage." It is not clear whether Judge DiSalle considered Paragraph 4 of the Prenuptial Agreement which states what is to happen upon separation. It states [Wife] is entitled to support. There are procedures and guidelines for obtaining support, yet [Wife] wholly ignored them and proceeded to seek enforcement in motions court. [Wife] was successful, so successful to the extent that she obtained orders first freezing [Husband's] separate non-marital asset 401k, then directing domestic support obligation reimbursement disbursements to [Wife] from the 401k for expenses related to her own separate non-marital assets. . . . [Wife] continues to press for enforcement in motions court to the extent that she now has [Husband] on the brink of incarceration. The prior holding(s) would thus serve to create manifest injustice on [Husband], not only in loss of his non-marital asset but he will be jailed. This is exactly the type of case where the exception to the coordinate jurisdiction rule applies. . . .

[Wife] makes much of the fact that [Husband] had previously withdrawn money from his 401k. He was Ordered to pay 100% of his income into a joint account. [Husband] is left with nothing. Where was he supposed to get money? [Wife] would not agree to withdrawals. The support guidelines would not leave him in such a position.

Husband's Brief in Support of Omnibus Mot., 1/14/13, at 8-9 (unpaginated).

After considering Wife's responsive brief, Judge Gilman granted Husband's omnibus motion on February 1, 2013. The court vacated all prior orders commanding Husband to pay 50% or 100% of his income to Wife as support. Order, 2/1/13. The parties stipulated that per those orders, Husband had paid $84,056.38 to Wife. Joint Ex. 1 at ¶ 14.[12] The court

---

[12] As discussed below, Wife did not reimburse Husband for these amounts. Rather, that sum was credited as Wife's alimony *pendente lite*.

- 11 -

reasoned that Judge DiSalle's prior interpretation that Paragraph 3(c) applied after the parties separated was incorrect. Trial Ct. Op., 2/1/13, at 4.[13]

Over the next three years, each party changed counsel several times.[14] The parties filed numerous motions on countless issues. One such motion was Wife's October 3, 2014 motion for sanctions, claiming Husband failed to respond to her request for documents. In an order issued that day, the court, among many other things, noted Husband's "blatant disregard" of two of the court's prior orders instructing Husband to respond to Wife's discovery requests. The trial court ordered that Husband "shall pay counsel fees to [Wife's] attorney. Said amount to be determined at the master hearing regarding equitable distribution." Order, 10/3/14.

In addition to deferring the issue of counsel fees, the court also similarly deferred the issue of alimony *pendente lite*. In a September 28, 2013 order, the court canceled a hearing regarding alimony *pendente lite* and stated, "Said issue shall be consolidated with those claims heard by the divorce master if the parties are unable to settle." Order, 9/28/13.

---

[13] On February 20, 2013, Wife filed a petition to clarify the court's February 1, 2013 order and to certify the order for interlocutory appeal. The court denied Wife's petition that day.

[14] Wife's present counsel entered an appearance just a month before trial.

Eventually, in October 2015, the court ordered Husband to pay $50 per month as provisional alimony *pendente lite*.  Joint Ex. 1 at ¶ 16.

Finally, almost six years after Husband filed for divorce, the court held a four-day trial in February 2016.  On April 14, 2016, the court issued an order resolving the issues raised at trial, including the deferred issues of counsel fees and alimony *pendente lite*.  Trial Ct. Op., 4/14/16, at 18.  We discuss each of the trial court's disputed holdings from that decision in detail below.  For now, we note that the court ordered Husband to pay alimony *pendente lite* of $110,187, which represents Husband's obligation from May 14, 2010 (the date the parties separated) through the end of March 2016.  *Id.* at 11.  The court also ordered Husband to pay his proportionate share of Wife's medical insurance premiums and Wife's unreimbursed medical expenses, which totaled $23,300.  Husband thus owed Wife support in a total amount of $133,487.  *Id.* at 12.  As noted above, however, Husband had previously paid $84,056.38 to Wife per Judge DiSalle's prior orders.  Husband also paid an additional $12,676.12 in provisional alimony *pendente lite* in 2013 to 2016.  Joint Ex. 1 at ¶ 17.[15]  Thus, after deducting Husband's prior payments, the court concluded Husband owed a net amount of $36,754.50 to Wife for support.  Trial Ct. Op., 4/14/16, at 12.

---

[15] Husband paid this sum to the Domestic Relations Office, instead of paying Wife directly, and that Office, in turn, transferred the funds to Wife.

In addition, the court held that Husband owed Wife an additional $32,201.59. The court calculated that figure from (1) the division of the marital portion of Husband's 401(k) retirement account,[16] which was the only marital asset subject to distribution, Trial Ct. Op., 4/14/16, at 7, (2) the amount Husband should reimburse Wife for paying the premiums on Husband's life insurance policy, and (3) counsel fees awarded to Wife, though in an amount less than Wife requested. The court therefore concluded that Husband owed Wife a grand total of $68,956.09 ($36,754.50 of support, plus $32,201.59 of the marital estate and counsel fees).

On April 19, 2016, the court entered its final decree of divorce. On May 12, 2016, Wife appealed from the April 1314, 2016 order; on May 20, 2016, Husband timely cross-appealed from the April 14, 2016 order.[17] We treat the parties' appeals as being from the April 19, 2016 final decree of divorce. *Cf. Rich v. Acrivos*, 815 A.2d 1106, 1107 n.1 (Pa. Super. 2003) (holding that premature appeal from order declaring marriage irretrievably

---

[16] The parties stipulated that $355,337.74 was the value of Husband's retirement account one day prior to the parties' separation. Joint Ex. 1 at ¶ 28. The court used that value to ascertain the portion subject to marital distribution. The value of that retirement account as of June 30, 2015 was $232,585.79. Joint Ex. 1 at ¶ 29. Husband's only other significant financial asset was the approximately $50,000 he received from selling his pre-marital residence shortly after the date of the parties' marriage. Trial Ct. Op., 4/14/16 at 8 n.13.

[17] This Court later consolidated both appeals. Order, 6/13/16.

broken was perfected when court entered divorce decree).[18]  The court did not order the parties to comply with Pa.R.A.P. 1925(b).[19]

## Wife's Appeal

Wife raises the following issues:

[1]  The trial court, presided over by Judge Gilman sitting in coordinate jurisdiction, erred in finding that an exception to the coordinate jurisdiction rule was warranted, and thus its reversal of Judge DiSalle's preceding Orders and findings was improper.

[2]  Assuming, *arguendo*, that the trial court under Judge Gilman was not already bound by Judge DiSalle's prior determinations as to the mortgage and Custom Homes judgment, it nevertheless erred in interpreting the Prenup to characterize these joint debts as Wife's separate, non-marital obligations.

[3]  The trial court abused its discretion in denying Wife's request for an award of equitable reimbursement.

[4]  The trial court abused its discretion in limiting wife's award of additional attorney's fees to $3,000, and in finding that

---

[18] Wife later filed a motion for special relief to amend the certified record. We grant that motion.

[19] Subsequently, Wife filed an emergency application for an injunction with this Court, requesting that this Court freeze Husband's financial accounts to prevent any dissipation.  Wife's Emergency Appl. for Inj., 12/23/16.  This Court ordered a temporary freeze that day, pending receipt of Husband's response.  Husband filed a response on December 28, 2016, claiming, among other things, that he has paid all court-ordered counsel fees and complied with the court's equitable distribution order.  Husband's Answer to Wife's Emergency Appl. for Inj., 12/28/16, at ¶¶ 18-19.  On December 28, 2016, this Court vacated its December 23, 2016 order, denied Wife's emergency application for relief, lifted any freeze, and granted the trial court permission to resolve any "matters that [did] not involve the pending issues" in these appeals.  Order, 12/28/16.

Wife's counsel fees are "grossly out of proportion to the relative value and complexity of the case."

Wife's Brief at 33, 41, 48, 55.

As we stated in **Laudig v. Laudig**, 624 A.2d 651, 653 (Pa. Super. 1993), with respect to appeals regarding the financial terms of divorce decrees:

> Our standard of review on appeal is a narrow one. We need determine only whether the trial court committed an error of law or an abuse of discretion. We do not usurp the trial court's fact-finding function.

We must decide, "Was there an error in the law's application, or is this appeal mere financial frustration?" **Colonna v. Colonna**, 791 A.2d 353, 355 (Pa. Super. 2001) (citation omitted), **appeal denied**, 803 A.2d 732 (Pa. 2002).

*The Coordinate Jurisdiction Rule and*
*Interpretation of Paragraph 3(c) of the Prenuptial Agreement*

As set forth above, one of the primary sources of dispute in this litigation is the proper interpretation of Paragraph 3(c) of the Prenuptial Agreement. Paragraph 3 dealt with a broad range of topics. Much of it dealt with gifts and rights of inheritance. Paragraph 3(c) dealt with the parties' creation of marital assets during an ambiguous period following their wedding:

> c. It is hereby acknowledged that as of the date of this Agreement, [Wife] is the owner of her personal residence located at . . . Arrowhead Lane, Eight[y] Four, PA. . . . The parties acknowledge that **following the contemplated marriage**, [Wife] will sell her personal residence and utilize a portion of the

- 16 -

proceeds therefrom to acquire a new marital residence for the parties. . . .

**Following the marriage**, both parties shall contribute their entire net income to a joint account or accounts, to be utilized for household and living expenses of the parties **during the term of the marriage**, and as the source of payment for mortgage payments, property taxes and all other expenses of the marital residence. The parties acknowledge that their contributions to this account or accounts shall not be equal.

In the event that the marriage ends as a result of divorce, [Husband] agrees to vacate the property, waiving any and all right, title and interest in and to all equity, and all appreciation in the value of the marital residence during the course of the marriage. . . .

R.R. at 1058a-59a (emphases added).

The prenuptial agreement did not define the term "marriage" as it was used in the Agreement, but Paragraph 11 stated, "In the construction of this Agreement, the parties hereto intend and agree that the separate provisions of this Agreement shall be construed as a whole and, where possible, consistent with each other." R.R. at 1069a. In this connection, the construction of Paragraph 3(c) also implicated Paragraph 4, which provided:

Each of the parties hereby agrees that in the event the marital relationship contemplated hereunder, once contracted, shall thereafter no longer be maintained, whether under the provisions of a separation agreement, by reason of separation, divorce, or otherwise, no claim for spousal support, maintenance, alimony, . . . or alimony pendente lite and/or counsel fees may be made by [Husband], but such claims shall be available to [Wife] as if this Agreement did not exist, and no claims for costs and expenses shall be made by either against the other or against the estate of the other . . . .

R.R. at 1061a-62a.

- 17 -

Judge DiSalle interpreted Paragraph 3(c) as obligating Husband to continue depositing his paycheck (and later, a portion of his unemployment compensation) into the parties' joint bank account for so long as the parties remained formally married — even after the parties had separated. Judge Gilman, on the other hand, concluded that Paragraph 3(c) obligated payments by Husband only until the marriage was no longer maintained, and he viewed the provisions in Paragraph 4 for support and alimony *pendente lite* as governing payments to Wife after the parties' separation. Judge Gilman therefore determined that Judge DiSalle's interpretation of Paragraph 3(c) was erroneous and reversed all prior orders compelling Husband to deposit his paycheck or unemployment compensation proceeds after the parties separated.

Typically, under the doctrine of coordinate jurisdiction, one trial judge cannot overturn an order issued by another trial judge. We recently discussed the "coordinate jurisdiction" rule as follows:

> Within [the law of the case] doctrine lies the directive that judges sitting on the same court in the same case should not overrule each other's decisions, otherwise known as the "coordinate jurisdiction rule."
>
> The purposes behind the law of the case doctrine and the coordinate jurisdiction rule are (1) to protect the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end. Only in exceptional circumstances, such as an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly

erroneous and would create a manifest injustice if followed, may the doctrine be disregarded.

***Mariner Chestnut Partners, L.P. v. Lenfest***, 152 A.3d 265, 282 (Pa. Super. 2016) (citations and some quotation marks omitted). The last exception, relating to a clearly erroneous prior holding that would create manifest injustice if followed, is at issue here. Our Supreme Court has discussed the limited purpose of that exception:

> To accede to a coordinate judge's order that is clearly erroneous would be not only to permit an inequity to work on the party subject to the order, but would allow an action to proceed in the face of almost certain reversal on appellate review. Moreover, the requirement that the prior holding also create a manifest injustice serves as a significant curb on the exception so that it would apply to only those situations in which adhering to the prior holding would be, in essence, plainly intolerable.

***Zane v. Friends Hosp.***, 836 A.2d 25, 29-30 (Pa. 2003).

Husband contends that Judge DiSalle's interpretation of Paragraph 3(c) was clearly erroneous and that it subjected him to a manifest injustice, thereby making it proper for Judge Gilman to depart from the erroneous interpretation. Wife, on the other hand, contends that Judge Gilman violated the coordinate jurisdiction rule by improperly reversing Judge DiSalle's prior rulings. She asserts that Judge Gilman failed to establish that Judge DiSalle's original order was both "clearly erroneous" and "would create a manifest injustice if followed."

Our standard of review of an order implicating the coordinate jurisdiction rule is *de novo*, and our scope of review is plenary. ***Zane***, 836

A.2d at 30 n.8. In considering this question, we recognize that, although presented in the context of conflicting rulings by different trial judges and the limits of the coordinate jurisdiction doctrine, the ultimate question that must be resolved here is the proper interpretation of Paragraph 3(c). Even if Judge Gilman had adhered to Judge DiSalle's interpretation of that paragraph, that interpretation could not stand on appeal if we ultimately were to conclude that the two judges' agreed-upon interpretation was wrong. Therefore, although we remain mindful of the coordinate jurisdiction implications here, we focus initially on discerning the correct meaning of the parties' agreement.

In this connection, we observe:

> The determination of marital property rights through prenuptial, post-nuptial and settlement agreements has long been permitted, and even encouraged. [T]he Supreme Court recognized that prenuptial agreements are contracts, and as such, are governed by contract law. Similarly, contract principles apply to antenuptial and post-nuptial agreements. It has been held that absent fraud, misrepresentation, or duress, spouses should be bound by the terms of their agreements.

*Laudig*, 624 A.2d at 653 (citations omitted); *accord Sabad v. Fessenden*, 825 A.2d 682, 686 (Pa. Super.), *appeal denied*, 836 A.2d 122 (Pa. 2003). Husband contends that Paragraph 3(c) is ambiguous.

> Whether a contract contains ambiguous terms is a question of law. To determine whether there is an ambiguity, it is proper for a court to hear evidence from both parties and then decide whether there are objective indications that the terms of the contract are subject to differing meanings. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one

sense. The fact that the parties do not agree upon a proper interpretation does not necessarily render a contract ambiguous.

**Nicholas v. Hofmann**, 158 A.3d 675, 693 (Pa. Super. 2017) (citations omitted). "[I]t is axiomatic that contractual clauses must be construed, whenever possible, in a manner that effectuates all of the clauses being considered." **Lenau v. Co-eXprise, Inc.**, 102 A.3d 423, 430 (Pa. Super. 2014) (citation omitted), **appeal denied**, 113 A.3d 280 (Pa. 2015).

In support of her interpretation of the contested agreement language, Wife points out that the second paragraph in Paragraph 3(c) uses the phrase "during the term of the marriage." She maintains that this phrase means that Husband's payment obligation was to "persist as long as the marriage does." Wife's Brief at 36. Wife reasons that the parties addressed any potential separation in Paragraph 4 of the prenuptial agreement. Therefore, in Wife's view, Paragraph 3(c) did not contemplate the parties' separation. Had the parties intended Paragraph 3(c) to address separation, the disputed clause would have obligated Husband "to contribute his net income to the joint account, 'during the term of the marriage or until such time as the parties separate.'" **Id.** at 36-37. Because Paragraph 3(c) obligated Husband to continue to pay after separation and until the parties' divorce,

Wife argues that Judge Gilman's reasoning rendered the phrase "during the term of the marriage" "out of existence." *Id.* at 37.[20]

In arriving at a contrary interpretation of the Agreement, the trial court reasoned as follows:

> On a macro-level review of the agreement, there is a flow about it which is defined by the status progression of the parties' relationship from before, during, and after marriage. The first paragraphs describe separate property brought to the marriage and the issue of disclosure. Moving to the language in question of paragraph 3(c), it is directly in the middle of the before marriage and after marriage segments. This delineation is self-evident because the language of the paragraph immediately thereafter states, "In the event that the marriage ends as a result of divorce...."
>
> This macro-perspective is only given greater credence when viewing the agreement on a micro-level. The phrase "following the marriage" does not mean after the marriage ends. In paragraph 3(c), the same paragraph with the contested language, there is a second use of "following the marriage." Specifically, the agreement reads, "Following the contemplated marriage [Wife] will sell [her then-current residence] and utilize a portion of the proceeds to acquire a new marital residence for the parties." This language could never be interpreted to affect the period after the marriage. If it were read in the same context as alleged by [Wife], then it would require [Wife] to sell her current residence and invest the proceeds in a new joint residence after separation. This interpretation defies logic.

---

[20] Wife also contends Judge Gilman made his ruling without the transcripts of hearings resolving Wife's petitions to enforce the court's May 19, 2010 order, and should have deferred to Judge DiSalle's interpretation because it was based on the hearings. We find this contention without merit. Judge Gilman properly relied primarily on the agreement's language. And, in any event, our review of the record shows that no party testified with any precision about the term at issue. Wife points to no extrinsic evidence from the hearings that carries controlling weight on this question.

The language in later paragraphs, specifically paragraph 4 of the agreement, also use clear, precise terms like divorce and/or separation to designate the termination of the marriage. For example, the agreement states, "[I]n the event the marital relationship contemplated hereunder, once contracted, shall thereafter no longer be maintain[ed], whether under the provisions of a separate agreement, by reason of separation, divorce...." More importantly, this language and paragraph describes the parties' rights to support once they separate. . . .

If the intent was for [Husband] to continue to deposit 100% of his wages into the joint account after the two parties separated, the contract drafters would have used these terms. Furthermore, the language "following the marriage" means following the *act* of becoming married as shown by legal definitions of marriage.

Trial Ct. Op., 2/1/13, at 4-5 (footnote omitted).

We agree with Judge Gilman's reasoning that the disputed language required Husband to deposit his net income after the parties' marriage ceremony but not after the parties separated or divorced. Paragraph 3(c) discusses income contributions "following the parties' marriage"[21] to pay "for household and living expenses of the parties during the term of the marriage," but it does not explain what "term of the marriage" means in the context of a marital breakup that begins with a separation. While it certainly is true that a marriage ends upon entry of a formal decree under the Divorce Code, 23 Pa.C.S. § 3323, Paragraph 4 addresses what happens when "the marital relationship contemplated hereunder, once contracted, shall

---

[21] As Judge Gilman held, the word "marriage" in this phrase refers to the act by which the parties entered into their civil contract of marriage. **See generally** Marriage Law, 23 Pa.C.S. § 1102.

thereafter no longer be maintained, whether under the provisions of a separation agreement, by reason of separation, divorce, or otherwise." The Agreement thus did not view a divorce decree as the only way in which the marriage contract would cease to be effective.

Importantly, Paragraph 4 specifically provided that Wife could pursue a support claim if the parties separated. R.R. at 1061a-62a. Wife's interpretation would entitle her to Paragraph 3(c) income at the same time as she could receive post-separation support under Paragraph 4, giving her a right to double-recovery that is not implied by any reading of the parties' agreement. We therefore conclude that Judge Gilman's construction of the Agreement is the more reasonable one that both effectuates and is in harmony with the entire prenuptial agreement. *See Nicholas*, 158 A.3d at 693; *Lenau*, 102 A.3d at 430. Accordingly, Judge Gilman did not err in holding that Judge DiSalle's interpretation was clearly erroneous.

Judge Gilman also did not err in concluding that he could depart from Judge DiSalle's interpretation because it caused a substantial injustice. *See Zane*, 836 A.2d at 29-30. Judge DiSalle's order obligated Husband to deposit 100% (and later, 50%) of his net income into the parties' joint bank account to pay for expenses at the same time as he was to pay Wife spousal support or alimony *pendente lite*. Such a requirement imposed an obvious hardship and was unjust. Wife argues that there was no manifest injustice

to Husband, particularly in light of Husband's "prolonged non-compliance." Wife's Brief at 38. We disagree, and we defer to Judge Gilman on this issue.

We therefore conclude that Wife's first issue merits no relief.

### *The Dyers Stone Mortgage*

Wife's second issue concerns the $623,200 mortgage debt on the Dyers Stone property. The trial court held that she is responsible for that debt. Wife contends that Husband shares that responsibility.

This issue implicates a different section of the prenuptial agreement, Paragraph 6, which states:

> Except as otherwise expressly provided herein, neither party, nor his or her property, shall be held liable for or subject to the debts of or the claims against the other party, whether such debts or claims be acquired prior to or during the marriage of the parties.

R.R. at 1066a. However, a full understanding of Paragraph 6 requires consideration of the first portion of Paragraph 3(c), which provides:

> c. It is hereby acknowledged that as of the date of this Agreement, [Wife] is the owner of her personal residence located at . . . , Eight[y] Four, PA. . . . Both [Husband] and [Wife] acknowledge that this residence is the non-marital property of [Wife], and in this regard, [Husband] specifically acknowledges that he waives any and all right, title and interest he may have by virtue of his marriage to [Wife] in her personal residence, or the proceeds therefrom, however invested or titled. The parties acknowledge that following the contemplated marriage, [Wife] will sell her personal residence and utilize a portion of the proceeds therefrom to acquire a new marital residence for the parties. The amount of the proceeds that [Wife] will invest in the new marital residence along with all equity and appreciation in the new marital residence shall remain [Wife's] non-marital property. The new marital residence shall be titled in [Wife's] name, but shall be subject to the terms and conditions set forth

in this Agreement. The parties shall cooperate to obtain mortgage financing for the new marital residence, and [Husband] will co-sign mortgage documents, if required. If required by the lending institution, the property shall be titled in joint names, as tenants by the entireties, but shall remain subject to the terms and conditions set forth in this Agreement.

R.R. at 1058a-59a. Pursuant to this provision, Husband co-signed the Dyers Stone mortgage documents and the property was titled in the parties' joint names.

In April of 2008, two years before the parties separated, Husband signed a Waiver of Spousal Interest releasing any right, title, or interest Husband had in the Dyers Stone property. It reads:

[Husband], now and forever, release[s] any right, title or interest I may have in the [Dyers Stone property ("Real Estate")] that is to be jointly titled in my name and my Wife's name. The titling of the Real Estate, in joint names, is so that [Wife] is able to obtain financing; and is not meant to convert or transmute the Real Estate into marital property. This Waiver on my part is made consistent with Paragraph 3, sub-section C of the Prenuptial Agreement that my Wife and I executed on December 19, 2006. I respectfully request that any Court of competent jurisdiction enforce this Waiver against me consistent with the cited terms and provisions of said Prenuptial Agreement.

Absent a written Agreement to the contrary, the Real Estate shall be my Wife's sole and separate property, regardless of how titled, and shall be free from any claim by me as a consequence of our marriage.

Husband's Ex. 8, R.R. at 1162a.

Wife agrees that the prenuptial agreement is silent on whether Husband is jointly responsible for the $623,200 mortgage on the Dyers Stone residence. Wife's Brief at 43; Trial Ct. Op., 4/14/16, at 5 & n.10.

- 26 -

Wife contends, however, that the trial court misconstrued Paragraph 6 by holding that because the Dyers Stone property is Wife's separate property, Wife is solely responsible for the mortgage. She reasons that the parties could have included explicit language in the agreement that any joint mortgage would be Wife's sole obligation. *Id.* at 44. Because the parties did not do so, Wife concludes that the mortgage should be considered a joint marital debt. *Id.* In support of this contention, Wife references what she characterizes as Husband's "active" involvement with the design and construction of the home, as well as the subsequent litigation about that design and construction. *Id.* In sum, although the Dyers Stone residence is Wife's non-marital property, Wife wants the mortgage on the property to be considered marital debt and thus part of the marital estate.

Husband counters that this Court's decision in *Colonna*, 793 A.2d 353, controls. In Husband's view, the Court in *Colonna* addressed similar facts involving a prenuptial agreement that was silent on the apportionment of marital debt. Husband's Reply Brief at 10-11. *Colonna*, according to Husband, held that, notwithstanding that the bank required each party to join each other's mortgage on the non-marital property, the debt followed the property. *Id.* at 11. Thus, Husband posits that although he co-signed

the Dyers Stone mortgage,[22] the mortgage remains Wife's non-marital debt because the Dyers Stone residence is Wife's non-marital property.

Wife, in her sur-reply, contends **Colonna** is factually distinguishable and highlights that, in contrast to **Colonna**, in which only one spouse held title to the property, Husband and Wife have joint title, which underlies the joint mortgage. Wife's Sur-Reply Brief at 4. Wife also asserts that although Husband waived any interest in the lot, he waived no such interest in the home itself. **Id.** at 5.[23]

The trial court construed Paragraph 6 and held the Dyers Stone mortgage was Wife's separate, non-marital property. Trial Ct. Op., 4/14/16, at 6. In the court's view, to conclude that the Dyers Stone mortgage was marital debt would render Paragraph 6, which states that one spouse and his or her property may not be held liable for the debts of the other spouse, superfluous. **Id.** The trial court reasoned that Husband co-signed the mortgage note only because Wife could not obtain the mortgage on her own. **Id.**

In **Colonna**, the parties executed a post-nuptial agreement that limited each party's interest in the other's pre-marital property and any "property acquired in individual names during the marriage." **Colonna**, 791

---

[22] Husband agrees "that he has a contractual liability with the bank" for the mortgage. Trial Ct. Op., 4/14/16, at 5.

[23] Wife cites no authority in support of this assertion.

A.2d at 354. The agreement did not apportion debt or mention a mortgage, other than stating:

> [E]ither party could encumber their own property, and the other agreed to join in a mortgage if required by the lender. Restated, each party agreed to cooperate in the other's encumbering of their own property. Looking at this plan, we see the requirement to join a mortgage as a marital accommodation to facilitate getting a loan; such a mortgage may be an obligation the bank can enforce, but it is not an agreement to undertake an obligation to the other party for half the debt.

*Id.* at 358. The Court reasoned that the intent of this clause was to have "the debt follow[] the property, regardless of the names on the mortgage. This explains the requirement each join the other's mortgage, and the absence of provisions assigning it separate from the property encumbered." *Id.*

For the property that was jointly titled, this Court held that the trial court correctly gave each party half of the net value of the property, that is, the full value of the property minus the full value of the mortgage, divided in half. *Colonna*, 791 A.2d at 358. The trial court, however, also held that for property titled solely in the wife's name, the wife would receive the full value of the property, and the husband was ordered to pay half of the outstanding mortgage. *Id.* In other words, the value of the wife's solely-titled property was not "netted out" for the full value of the outstanding mortgage. *Id.* This Court found that approach by the trial court was error and held that because the wife held sole title to the property, she should receive all of the

- 29 -

net value, *i.e.*, the full value of the property minus the full value of the parties' joint mortgage:

> Debt is not "titled", as the [trial] court suggested. The presence of both names [on the mortgage] reflects each party's obligation to the lender of 100% of the debt (not 50% each as the court suggests), but it does not reflect any agreement between Husband and Wife to pay for mortgages on each other's [solely titled] property.

*Id.*

Instantly, we agree with the trial court that **Colonna** controls and the Dyers Stone residence is Wife's non-marital property, notwithstanding that the property is jointly titled. We reach this conclusion for several reasons. First, the prenuptial agreement explicitly stated that the marital residence, Dyers Stone, was Wife's non-marital property. R.R. at 1058a-59a. Second, all equity and appreciation in the new marital residence were Wife's non-marital property. *Id.* Third, Husband waived all right, title, and interest he had in the Dyers Stone residence notwithstanding that the property was jointly titled. R.R. at 1062a. The only reason Husband's name was on the property was so that Wife could obtain financing. *Id.* Finally, the waiver signed by Husband reiterated that Dyers Stone was Wife's sole property, regardless of how it was titled, and Husband had no claim to it. *Id.*

As in **Colonna**, the instant prenuptial agreement is silent regarding a joint mortgage. Wife's Brief at 43; **Colonna**, 791 A.2d at 358. We acknowledge that in **Colonna** we held that the trial court properly split the net value of the jointly-titled property in half, but the jointly-titled property

in **Colonna** was not subject to a prenuptial agreement that made it the property of only one party for purposes of equitable distribution. Here, on the other hand, Dyers Stone is Wife's non-marital property under the prenuptial agreement and Husband's waiver, notwithstanding the joint title. Like the Court in **Colonna**, we hold that "[s]ince Wife has sole ownership of [Dyers Stone], she should receive all of the **net** value of [Dyers Stone] after subtraction of the mortgage debt." **Id.** at 358.[24] Absent any clause requiring Husband to pay half the mortgage to Wife if the parties' marriage ended, the debt follows the property. **Id.** Wife's insistence that Husband played a significant role in the design and construction of the marital home has no bearing on this issue. Accordingly, Wife's second issue entitles her to no relief.

### The Custom Homes Judgment

The construction of the Dyers Stone home resulted in several lawsuits, including an arbitration that culminated in a $64,032.21 judgment entered against Husband and Wife, jointly and severally, in December of 2010, after the parties' separation. Order, 9/7/11, R.R. at 780a. The trial court held

---

[24] The parties stipulated that Dyers Stone has a "fair market value 'as is' of between negative $100,000 and negative $200,000." Joint Ex. 1 at ¶ 22 (unpaginated); **accord** Trial Ct. Op., 4/14/16, at 3 n.6 (citing Joint Ex. 1). But if Dyers Stone had a positive market value, accepting Wife's argument would, as in **Colonna**, grant Wife the full value of Dyers Stone minus one-half of the outstanding mortgage. Such a result would be contrary to the parties' agreement.

that the arbitration judgment was Wife's non-marital debt. In justifying that holding, the trial court adopted the same reasoning it applied when holding that the Dyers Stone mortgage was Wife's non-marital property — that is, that the judgment was not a marital debt subject to distribution. Trial Ct. Op., 4/14/16, at 6-7.

Wife correctly points out that the trial court's rationale failed to acknowledge that both parties signed the agreement to construct the Dyers Stone residence — the agreement that formed the basis of Custom Homes' breach of contract suit. N.T. Hr'g, 2/23/16, at 46, R.R. at 82a. Wife opines that, rather than construing the prenuptial agreement, the court, notwithstanding the agreement's silence on the issue, improperly "drafted" a clause making that judgment her non-marital debt. Wife's Brief at 46-47. Instead, Wife wants the judgment categorized as a marital debt shared by Husband after the marital estate is divided.

Generally, "[b]etween divorcing parties, debts which accrue to them jointly prior to separation are marital debts." *Litmans v. Litmans*, 673 A.2d 382, 391 (Pa. Super. 1996) (citation omitted). In *Litmans*, this Court resolved whether funds borrowed pre-separation from the husband's pension fund and used to finance their children's education should be a marital debt. *Id.* We affirmed on the basis of the trial court's finding that the husband credibly testified that the funds were borrowed prior to their separation; thus, the debt was marital. *Id.*

In **Duff v. Duff**, 507 A.2d 371 (Pa. 1986), the parties sold stock prior to the parties' separation; after the parties separated, the IRS assessed additional income tax based on an incorrect tax treatment of the pre-separation stock sale. **Id.** at 372. The question before our Supreme Court was whether the post-separation tax assessment was a marital debt. **Id.** The Court held the debt was marital because the tax liability was directly traceable to the sale of stock that occurred prior to the parties' separation. **Id.** at 373. Furthermore, "[t]he proceeds were not diverted by either party to his or her exclusive use." **Id.**

Here, the Custom Homes litigation began in 2009, after the parties married in 2006 and prior to their separation in April of 2010. The court entered judgment against Husband and Wife in November of 2010, after the parties' separation. Similar to the tax liability in **Duff**, the judgment is directly traceable to a pre-separation lawsuit. **See Duff**, 507 A.2d at 373; **see also Litmans**, 673 A.2d at 391. We therefore hold that the judgment is a joint debt and that the trial court erred when it equated the judgment with the Dyers Stone mortgage, which followed that property because of Wife's sole ownership of the property. The fact that Custom Homes' suit stemmed from a dispute regarding construction of Wife's Dyers Stone house did not turn Custom Homes' judgment into a debt that attached only to that property; it was a personal debt on which both parties were jointly and severally liable.

Our holding is bolstered by the rationale advanced by the Supreme Court in **Focht v. Focht**, 32 A.3d 668 (Pa. 2011). The then-married couple in **Focht** filed a personal injury lawsuit in 2000, and the case was settled on November 23, 2004. 32 A.3d at 669. Meanwhile, in August of 2001, the parties separated, the wife filed for a divorce in February of 2004, and the parties were divorced in January of 2009. **Id.** After defining "accrue" and discussing cases construing the term, our Supreme Court held that "an award or settlement arising from a cause of action or claim that accrued during the marriage of the parties, before final separation, is marital property subject to equitable distribution." **Id.** at 673. The Court stated:

> [B]ecause [the parties'] cause of action accrued during the marriage, before the parties' final separation, proceeds from the settlement of the suit are marital property. The marital property exception set forth in subsection 3501(a)(8) does not apply, and it is irrelevant that the parties had finally separated by the time the suit settled and the settlement award was liquidated.

**Id.** at 674.[25]

In this case, if the parties had filed counterclaims in the Custom Homes litigation and prevailed, the resulting award or settlement would be marital property because the cause of action accrued prior to the parties' separation. **See Focht**, 32 A.3d at 673. It follows that any debt or adverse

---

[25] Section 3501(a)(8) states that marital property does not include "Any payment received as a result of an award or settlement for any cause of action or claim which accrued prior to the marriage or after the date of final separation regardless of when the payment was received." 23 Pa.C.S. § 3501(a)(8).

judgment associated with the pre-separation lawsuit would be marital debt. *Id.* We therefore conclude that the trial court erred, and the $64,032.21 judgment is a marital debt attributable to both parties. *See Colonna*, 791 A.2d at 355.

We therefore reverse the portion of the trial court's decision that attributed the judgment solely to Wife.

*Equitable Reimbursement*

Wife contends that the trial court abused its discretion by denying her request for equitable reimbursement. We review an order resolving a request for equitable reimbursement for an abuse of discretion. *Bold v. Bold*, 574 A.2d 552, 556-57 (Pa. 1990).

In her appellate brief, Wife extensively discusses the doctrine of equitable reimbursement, which is "a method of compensating a spouse for his or her contribution to the marriage where the marital assets are insufficient to do so." Wife's Brief at 48 (quoting *Wang v. Feng*, 888 A.2d 882, 888 (Pa. Super. 2005)). Wife asserts that she has been paying for the Dyers Stone mortgage during the divorce litigation. She notes that she bore the costs of defending the Custom Homes lawsuit, as well as contesting Husband's bankruptcy filings. Those expenses, Wife maintains, should have been considered by the court in light of the impact of the prenuptial agreement. Wife's Brief at 53. In Wife's view, the prenuptial agreement did not preserve her pre-marital assets, but exhausted them: her premarital

home was used as collateral to secure the Dyers Stone mortgage, a property with a negative fair market value. *Id.* Given that the marital portion of Husband's 401(k) account is insufficient to make Wife whole, Wife insists that the trial court should have awarded her equitable reimbursement. *Id.* at 53-54. Wife also challenges the trial court's reasoning for denying equitable reimbursement and asserts that the trial court erred in failing to analyze the factors set forth at 23 Pa.C.S. § 3502(a) in denying equitable reimbursement.

Husband counters that equitable reimbursement does not apply to this case. In Husband's view, equitable reimbursement is permitted when a spouse has "contributed to the 'increased earning capacity' or education of the other spouse, and cannot be reasonably compensated for such contribution from the marital estate." Husband's Reply Brief at 14. Husband argues that none of the facts justifying equitable reimbursement exist in this case. *Id.* at 14. He points out that Wife did not work during the marriage; he was the sole "breadwinner during the entire marriage" and "did not obtain further education during the marriage that would increase his education or earning power." *Id.* Further, Husband notes, the only marital asset to be divided is the marital portion of his 401(k) retirement account. Given that the parties were married for only three-and-one-half years and that the Dyers Stone property, mortgage, and Custom Homes judgment were all Wife's debts, Husband argues that there is no marital debt. *Id.* at

15. He claims that equitable reimbursement cannot be used to pay a party's non-marital debt. *Id.*

In the alternative, Husband argues that if this Court concludes that the property, mortgage, or judgment should be labeled a marital debt, then Wife is still not entitled to equitable reimbursement. Husband's Reply Brief at 14-15. Husband reasons that Wife "has not paid on the debts she is claiming to be burdened by," and has "chosen to unilaterally pursue the endless years of litigation instead of repairing the home." *Id.* at 15-16. Thus, there is no basis for awarding equitable reimbursement to Wife, as Husband is fully obliged to pay the outstanding marital debt. *Id.* at 16.

The trial court declined to award equitable reimbursement because the parties executed a prenuptial agreement resolving the division of the marital and non-marital assets. Trial Ct. Op., 4/14/16, at 16. Further, "there was no evidence that wife contributed to husband's education or increased earning power during the marriage. Finally, . . . the mortgage debt on the Dyers Stone . . . property and the $64,032.21 judgment related thereto are solely wife's debts; husband will not be repaying wife on a marital debt." *Id.*

> We set forth the following background on equitable reimbursement:
>
> In addition to division of the marital estate, the courts of this Commonwealth have created the doctrine of equitable reimbursement as a method of compensating a spouse for his or her contribution to the marriage where the marital assets are insufficient to do so. As this Court further summarized . . .

In **Bold v. Bold**, 524 Pa. 487, 574 A.2d 552 (1990), our Supreme Court found the doctrine of equitable reimbursement properly was applied where wife supported husband financially, annually contributing more than three times the amount husband contributed, for the first five years of the marriage while husband completed his post-graduate degree. Husband's attainment of that degree resulted in a substantial increase in his earning capacity. Less than two years after husband graduated with a degree in chiropractics, he asked wife to move out. The Court held that separate and apart from the equitable distribution of marital property, consistent with fairness, the supporting spouse in a case such as this should be awarded equitable reimbursement.... In **Bold**, there was insufficient marital property to compensate wife for her financial contributions to the marriage.

. . . **See also Zullo v. Zullo**, 531 Pa. 377, 380, 613 A.2d 544, 545 (1992); **Wagoner v. Wagoner**, 538 Pa. 265, 271, 648 A.2d 299, 302 (1994) (summarizing, "at dissolution each marriage [*i.e.*, those at issue in **Bold** and **Zullo**] possessed insufficient assets to repay the wife's sacrifice which had added so significantly to the husband's future financial status. Thus, in addition to equitable distribution, the wife in each case, for her efforts, was awarded payments, termed equitable reimbursement, in order to equalize the result."); **Twilla v. Twilla**, 445 Pa. Super. 86, 664 A.2d 1020 (1995) (applying equitable reimbursement principle to compensate wife for lost equity in marital home due to husband's failure to maintain mortgage payments where there was insufficient marital property from which to fashion sufficient equitable distribution award); Joanne Ross Wilder, Pennsylvania Family Law Prac. & Proc. (West 2005), § 22–13 (2002) (noting "equitable reimbursement may also be available [in the context of professional degrees, licenses and practices] where alimony is not appropriate but where fairness dictates an award of some sort."). Thus, it is clear that equitable reimbursement is nothing more than a method of compensating a spouse for that which is fairly due to him or her.

**Wang**, 888 A.2d at 888-89 (some citations and punctuation omitted).

"Relevant factors in fashioning an equitable distribution or reimbursement award are set forth at 23 Pa.C.S.A. § 3502(a)." ***Dalrymple v. Kilishek***, 920 A.2d 1275, 1280 (Pa. Super. 2007).  Those factors are:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party at the time the division of property is to become effective.

(10.1) The Federal, State and local tax ramifications associated with each asset to be divided, distributed or assigned, which ramifications need not be immediate and certain.

(10.2) The expense of sale, transfer or liquidation associated with a particular asset, which expense need not be immediate and certain.

(11) Whether the party will be serving as the custodian of any dependent minor children.

23 Pa.C.S. § 3502(a).

Instantly, the trial court denied Wife's request for equitable reimbursement because, among other reasons, the $64,032.21 Custom Homes judgment was Wife's non-marital debt. Trial Ct. Op., 4/14/16, at 16. We have held that the judgment is marital debt. Thus, the trial court's reasoning for denying equitable reimbursement was flawed. Accordingly, we vacate the portion of the trial court's order regarding equitable reimbursement so that the trial court may reconsider whether Wife is entitled to equitable reimbursement in light of our holding regarding the Customs Homes judgment.[26]

### Wife's Request for Counsel Fees

Due to Husband's refusal to comply with various court orders, the court thrice ordered Husband to pay counsel fees to Wife, with the amount to be determined at the equitable distribution hearing. On June 22, 2011, the trial court found that Husband engaged in vexatious litigation behavior, and awarded counsel fees of "$50,000 and other sums" as would be determined by the master. Order, 6/22/11. On July 14, 2011, the court stated it would resolve Wife's request for counsel fees when it divided the

---

[26] The trial court may again exercise its discretion to deny equitable reimbursement to Wife. The trial court, however, should discuss the Section 3502(a) factors. **See Dalrymple**, 920 A.2d at 1280.

- 40 -

marital estate. Order, 7/14/11. Finally, on October 3, 2014, the court ordered Husband to pay counsel fees to Wife based on his failure to comply with two court orders compelling him to respond to Wife's discovery requests. Order, 10/3/14. The order stated that the amount of counsel fees would be determined at the time of equitable distribution. *Id.*[27]

At trial, Wife requested $183,853.15 in counsel fees[28] for the divorce proceeding, as well as an additional $3,440 in expert fees. Trial Ct. Op., 4/14/16, at 17. Wife also requested counsel fees for defending her claims in Husband's bankruptcies and the two lawsuits involving Custom Homes and

---

[27] We note that although much of the wrangling in this case involved Husband's failure to comply with, and ultimately successful efforts to overturn, Judge DiSalle's initial interpretation of Paragraph 3(c) of the prenuptial agreement, the court made clear that there were additional grounds for an award of fees. *See generally Hill v. Divecchio*, 625 A.2d 642, 645 (Pa. Super. 1993) ("An order issued by a court with jurisdiction over the subject matter and the person must be obeyed by the parties until it is reversed by orderly and proper proceedings."), *appeal denied*, 645 A.2d 1316 (Pa. 1994).

[28] The $183,853.15 amount did not include the fees expended for the actual trial. The trial court did not identify a source for this amount or otherwise explain how it arrived at this figure, but the parties do not dispute it. Upon review of the certified record, it appears the source of this figure is one of Wife's numerous trial exhibits — an unlabeled exhibit with the title, "Legal Fees-All Cases (v.5)." This exhibit identified Wife's counsel fees for all litigation matters, including such matters as the construction litigation and Husband's bankruptcy, and stated that the fees for all litigation matters were $452,807.19. The non-divorce counsel fees total $268,954.04. The exhibit also identified expert fees totaling $36,347.30, or $32,907.30 for the non-divorce cases. The grand total of counsel fees for the non-divorce cases is $301,861.34.

the construction of the marital residence — apparently an additional $301,861.34. *Id.*

In resolving Wife's request for counsel fees, the trial court initially noted it had previously ordered Husband to pay Wife "$30,981.89 in counsel fees due to his obdurate and vexatious behavior." Trial Ct. Op., 4/14/16, at 17. Husband has paid that amount in full. Joint Ex. 1 at ¶ 31.

The trial court then reasoned that, although Wife did not provide any case support for her claim to additional fees —

> [T]here are several outstanding orders (June 22, 2011, July 14, 2011, October 3, 2014) stating that [W]ife's request for additional counsel fees due to [H]usband's contemptuous behavior would be addressed at the equitable distribution trial. With this in mind, the Court will order an additional $3,000.

Trial Ct. Op., 4/14/16, at 17 (footnote and citation omitted). The trial court explained why it limited the award to $3,000:

> Save the three specific instances addressed above, this Court has already addressed reimbursing [W]ife $30,981.89 for counsel fees. What is more, the only marital asset to value according to the prenuptial agreement is [H]usband's IRA, which does not require an expert. The prenuptial agreement addressed marital and non-marital property and how same was to be divided. The only issues that required litigation were [H]usband's support obligation to [W]ife and whether the mortgage on the Dyers Stone property was to be considered a marital debt. Certainly, these issues needed to be fully explored. . . . But, whether the mortgage is a marital debt should not take inordinate and extensive research and preparation for trial. The [c]ourt finds that wife's counsel fees are grossly out of proportion to the relative value and complexity of the case. Moreover, and importantly, [W]ife has a substantial

source of income from which she supports herself.[29] For these reasons, the [c]ourt denies additional fees.

Trial Ct. Op. at 17-18 (footnotes and citation omitted).

The standard of review for an award of counsel fees is an abuse of discretion. *Teodorski v. Teodorski*, 857 A.2d 194, 201 (Pa. Super. 2004). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Nobles v. Staples, Inc.*, 150 A.3d 110, 113 (Pa. Super. 2016) (citation omitted).

Wife argues that an award of $3,000 in counsel fees, in addition to the $30,981.89 previously awarded by the court, was too low. Wife's Brief at 56. Wife contends the trial court's basis for the $3,000 amount lacked any support in the record, and she attacks the court's assessment of credibility because it was based partly on facts outside of the instant record:

---

[29] The court explained:

> Wife testified on cross-examination that she "uses" her "mother's" PNC checking account . . . to support her on a daily basis. There was no testimony of how this account is titled, but wife has free access to it. The [c]ourt does not find her testimony credible that her withdrawals are to be repaid to mother.

Trial Ct. Op., 4/14/16, at 18 n.37. Wife's mother "loaned" $1,138,757.54 to Wife. *Id.* at 7.

It relied, in part, on observations relating to an ancillary claim, unrelated to the instant case, against Wife and her mother, arising from the original Custom Homes litigation. The trial court considered in some detail the nature of this case, and discussed certain interlocutory proceedings relating to it. These facts, however, are not present in the record of the instant case, and the trial court's reliance on them in its adverse credibility determination as to Wife is an abuse of discretion.

*Id.* at 57 (citations omitted).

After careful review of the parties' arguments, the record, and the decision of the trial court, we affirm on this issue on the basis of the trial court's opinion. *See* Trial Ct. Op., 4/14/16, at 17-18 (holding (1) Wife's requested counsel fees of $183,853.15 were excessive; (2) the court already ordered Husband to pay $30,981.89 for his obdurate and vexatious behavior; (3) the prenuptial agreement addressed the division of marital and non-marital property; (4) the only issues were Husband's support obligation and the Dyers Stone mortgage; and (5) Wife has a significant source of income). Contrary to Wife's assertion that the trial court relied on non-record facts in concluding she was not credible, the trial court specifically held: "The [c]ourt does not find her testimony credible that her withdrawals are to be repaid to mother." Trial Ct. Op. at 7 (Wife's mother loaned over one million dollars to Wife) & 18 n.37 (Wife uses her mother's checking account for daily living expenses). We cannot conclude that Wife established that the trial court abused its discretion in denying the entire amount that

she claimed.  **See Teodorski**, 857 A.2d at 201; **see also Nobles**, 150 A.3d

at 113.[30]

### Husband's Cross-Appeal

Having resolved Wife's issues, we examine Husband's issues, which

are:

> Did the trial court err and abuse its discretion in failing to terminate Husband's alimony *pendente lite* obligation at earlier date when the parties were only married a short period?
>
> Did the trial court err in calculating Wife's income by failing to include all sources of income reported on her tax return?
>
> Did the trial court err and abuse its discretion in obligating Husband for the full cost of the life insurance proceeds through date of divorce?

Husband's Brief at 4 (reordered to facilitate disposition).

*Length of Alimony Pendente Lite*

Briefly, the parties stipulated that the court "ordered Husband to pay

$50 per month to Wife as provisional" alimony *pendente lite* in October

2015.  Joint. Ex. 1 at ¶ 16.  At the divorce trial, the court awarded alimony

*pendente lite* as follows:

---

[30] We note that the value of Husband's retirement account in June of 2015 was $232,585.79.  Joint Ex. 1 at ¶ 29.  Thus, even if the trial court had awarded Wife $180,853.15 of counsel fees for the divorce, let alone the $301,861.34 non-divorce counsel fees, Husband's sole asset would be almost depleted, at best.  Husband's only other significant asset is the proceeds from the sale of his premarital home, which, at that time, was $50,000.  Trial Ct. Op., 4/14/16, at 8 n.13.

| | Husband's A.P.L. Obligation | |
|---|---|---|
| **Effective Date** | *Per Month* | *Per Year* |
| May 14, 2010[31] | 2,531 | 19,305 |
| January 1, 2011 | 2,717 | 32,604 |
| January 1, 2012 | 555 | 6,660 |
| January 1, 2013 | 630 | 7,560 |
| January 1, 2014 | 1,629 | 19,548 |
| January 1, 2015 | 1,634 | 19,608 |
| January 1 through March 2016 | 1,634 | 4,902 |
| **TOTAL** | | $110,187 |

Trial Ct. Op., 4/14/16, at 11 (footnote omitted).[32] In a footnote, the trial

court stated:

> The A.P.L. will be charged through March 2016. Husband argued that this obligation should be terminated after three and one-half years since the marriage lasted only three and one-half years. Pa.R.C.P. 1910.16-1(C)(2). Support orders, however, are effective from the date of filing. Pa.R.C.P. 1910.16-7(a). Husband has not filed a petition to modify/terminate. Therefore, the Court is unable to consider his request.

*Id.* at 11 n.26. The trial court later explained:

> The [c]ourt extended A.P.L. to the date of the trial because [H]usband caused some of the delay in the scheduling of the trial itself (as set forth above, [H]usband filed bankruptcies that had no merit and he was not cooperative in the discovery process) and because he never filed a petition to modify.

---

[31] This was the date Wife filed for alimony *pendente lite*.

[32] In addition to the $110,187 amount of alimony *pendente lite*, the court also determined that Husband owed Wife an additional $23,300 (Husband's proportionate share of Wife's medical insurance premiums and her unreimbursed medical expenses), for a total of $133,487. The parties had previously stipulated that Husband paid $84,056.38 directly to Wife and paid an additional $12,676.12 to the Domestic Relations Office for repayment to Wife. Trial Ct. Op., 4/14/16, at 12. Thus, Husband owed an additional $36,754.50 in alimony *pendente lite* and additional support. *Id.*

Further, the [c]ourt is not imposing A.P.L. if [W]ife files an appeal, nor is alimony being granted.

. . . The [c]ourt ordered [H]usband to pay five years of A.P.L., a year and one-half longer than the length of the marriage.

Trial Ct. Op., 4/14/16, at 13.[33]

"If an order of [alimony *pendente lite*] is bolstered by competent evidence, the order will not be reversed absent an abuse of discretion by the trial court." ***Strauss v. Strauss***, 27 A.3d 233, 236 (Pa. Super. 2011). Citing Pa.R.C.P. 1910.16-1(c), Husband argues that the award was in error because the trial court failed to consider the short length of the parties' marriage. Specifically, Husband objects to paying alimony *pendente lite* for "almost double the length of the marriage" when the parties were married for only three-and-a-half years. Husband's Brief at 10. He also points out that Wife requested several continuances, thus delaying the court's resolution of their divorce. ***Id.*** But for Wife's delays, Husband reasons, she would not have received this additional windfall. ***Id.*** at 10-11.

Wife counters that Husband failed to cite any case authority that a court cannot extend alimony *pendente lite* over an extended duration.

---

[33] In fact, the court ordered Husband to pay alimony *pendente lite* for a little over five years and ten months. The court, we note, could have ordered Husband to pay alimony *pendente lite* until resolution of any appeal from the divorce decree, but it declined to do so. ***See Brody v. Brody***, 758 A.2d 1274, 1281 (Pa. Super. 2000), ***appeal denied***, 786 A.2d 984 (Pa. 2001); ***DeMasi v. DeMasi***, 597 A.2d 101, 104 (Pa. Super. 1991) (stating, "a divorce is not final for purposes of APL until appeals have been exhausted and a final decree has been entered.").

Wife's Brief at 23. She maintains that the court actually did consider the duration of the parties' marriage, but that the divorce was delayed because Husband refused to comply with ten discovery requests and filed two meritless bankruptcy petitions.

The Divorce Code provides, "In proper cases, upon petition, the court may allow a spouse reasonable alimony pendente lite, spousal support and reasonable counsel fees and expenses." 23 Pa.C.S. § 3702. By way of background:

> [Alimony *pendente lite*] is an order for temporary support granted to a spouse during the pendency of a divorce or annulment proceeding. [Alimony *pendente lite*] is designed to help the dependent spouse maintain the standard of living enjoyed while living with the independent spouse. Also, and perhaps more importantly, [alimony *pendente lite*] is based on the need of one party to have equal financial resources to pursue a divorce proceeding when, in theory, the other party has major assets which are the financial sinews of domestic warfare. [Alimony *pendente lite*] is thus not dependent on the status of the party as being a spouse or being remarried but is based, rather, on the state of the litigation. . . . [T]he purpose of [alimony *pendente lite*] is to provide the dependent spouse equal standing during the course of the divorce proceeding . . . . [Alimony *pendente lite*] focuses on the ability of the individual who receives the [alimony *pendente lite*] during the course of the litigation to defend her/himself, and the only issue is whether the amount is reasonable for the purpose, which turns on the economic resources available to the spouse.

*Schenk v. Schenk*, 880 A.2d 633, 644-45 (Pa. Super. 2005).[34]

_____

[34] "Alimony, in contrast, is terminated upon remarriage or cohabitation." *Schenk*, 880 A.2d at 644 (citation omitted).

With respect to duration of alimony *pendente lite*, Pennsylvania Rule of Civil Procedure 1910.16-1(c)(2) states, "In determining the duration of an award for spousal support or alimony pendente lite, the trier of fact shall consider the duration of the marriage from the date of marriage to the date of final separation." A comment explains that the "primary purpose of this provision is to prevent the unfairness that arises in a short-term marriage when the obligor is required to pay support over a substantially longer period of time than the parties were married and there is little or no opportunity for credit for these payments at the time of equitable distribution." Pa.R.C.P. 1910.16-1, cmt. G. Thus, "alimony *pendente lite* may be terminated before the litigation is concluded where the recipient has acquired assets [or] income which sufficiently equalizes the financial ability of the parties to pursue the action." **Brody**, 758 A.2d at 1281 (citation omitted).

Instantly, contrary to Husband's argument, the trial court explicitly considered Rule 1910.16-1(c)(2). **See** Trial Ct. Op., 4/14/16, at 13. The trial court acknowledged that both parties contributed to the delay in the scheduling of the divorce trial, including Husband's filing of two meritless bankruptcy petitions. **Id.** But for the delay, the litigation would have ended earlier, which would likely have resulted in a shorter duration of alimony *pendente lite*. Because competent evidence establishes that the trial court

considered the length of the parties' marriage, we discern no abuse of discretion by the trial court. *See Strauss*, 27 A.3d at 236.

Husband also disputes the trial court's statement that he had not filed a petition for modification. Husband's Brief at 9-10 (referencing Trial Ct. Op., 4/14/16, at 11 n.26). He points out that he "was paying under an interim support order" until the February 2016 trial. *Id.* at 9 (apparently referencing the October 2015 order directing him to pay $50 per month of provisional alimony *pendente lite*. Joint Ex. 1 at ¶ 16). Husband emphasizes that he could not have moved for modification absent a **final** order resolving alimony *pendente lite*. *Id.* at 9 (stating, "there was not a final order for [Husband] to modify"). In support, Husband cites a September 28, 2013 order canceling the alimony *pendente lite* hearing and stating, "Said issue shall be consolidated with those claims heard by the divorce master if the parties are unable to settle." *Id.* at 9. Husband construes the order as barring him from filing any petition to modify because there was no final order. *Id.* In sum, Husband contends he could not have filed a petition to modify from an interim order of support; rather, he could only have filed such a petition from a final order of support. Wife did not address this argument in her appellate brief.[35]

_____

[35] Husband also claims that he filed a petition to modify alimony *pendente lite* on June 24, 2015. Husband's Brief at 10 (citing R.R. at 32a-25a (sic)). He maintains that the trial court did not entertain his petition because the alimony *pendente lite* issue was deferred to the equitable distribution
*(Footnote Continued Next Page)*

The premise of Husband's argument is false. Our case law is well-settled that Husband could have filed a petition to modify from an interim order of support at any time:

> [A]n award of support, once in effect, may be modified via petition **at any time**, provided that the petitioning party demonstrates a material and substantial change in their circumstances warranting a modification. **See** 23 Pa.C.S. § 4352(a); **see also** Pa.R.C.P. 1910.19. The burden of demonstrating a "material and substantial change" rests with the moving party, and the determination of whether such change has occurred in the circumstances of the moving party rests within the trial court's discretion. **See Bowser v. Blom**, 569 Pa. 609, 807 A.2d 830 (2002).

**Summers v. Summers**, 35 A.3d 786, 789 (Pa. Super. 2012) (emphasis added). Husband was not obligated to wait until the court issued a final order of support. **See id.** A "final" order resolving alimony *pendente lite* is not a necessary prerequisite for filing a petition to modify. **See id.**[36]

Husband therefore is entitled to no relief on this issue.

---

*(Footnote Continued)*

hearing. **Id.** However, the docket does not reflect Husband's purported filing, which tends to support the trial court's observation that Husband did not file a petition to modify. The reproduced record, R.R. at 34a-35a, includes what appears to be a petition for modification dated June 15, 2015, but the certified record for June 2015 does not include that petition.

[36] The rule is eminently practicable, because even if the trial court deferred final resolution of alimony *pendente lite* until the time of trial, a payor should not be barred from pursuing relief from an interim order of support due to a material change in the payor's financial circumstances prior to trial.

### *Amount of Alimony Pendente Lite*

Husband also challenges the trial court's calculation of Wife's income, which affected the amount of alimony *pendente lite* Husband must pay Wife. Trial Ct. Op., 4/14/16, at 10 n.19. Specifically, the trial court found Wife had an earning capacity of at least minimum wage, *i.e.*, $15,080 per year.[37] The standard of review for a challenge to the amount of alimony *pendente lite* is abuse of discretion. **See Strauss**, 27 A.3d at 236.

Husband contends the trial court failed to add Wife's income from a retirement account she inherited from her father. Husband refers this Court to Wife's 2012 tax return, in which Wife received a distribution of $8,954 from that retirement account. Husband's Brief at 16. Husband also points to Wife's testimony about that Individual Retirement Account, in which — according to Husband — she testified she "continued to receive $10,000 in

---

[37] Pennsylvania Rule of Civil Procedure 1910.16-2(d)(4) discusses earning capacity as follows:

> If the trier of fact determines that a party to a support action has willfully failed to obtain or maintain appropriate employment, the trier of fact may impute to that party an income equal to the party's earning capacity. Age, education, training, health, work experience, earnings history and child care responsibilities are factors which shall be considered in determining earning capacity. In order for an earning capacity to be assessed, the trier of fact must state the reasons for the assessment in writing or on the record. . . .

Pa.R.C.P. 1910.16-2(d)(4).

distributions every year since 2012." *Id.* at 16 (citing R.R. at 666a).[38]

According to Husband, Wife did not argue that the IRA distributions should be excluded for purposes of calculating alimony *pendente lite*.

In response, Wife refers this Court to her argument that the trial court did not abuse its discretion in awarding alimony *pendente lite* for almost six years. Wife does not articulate a specific argument that the trial court did not abuse its discretion in excluding the IRA distributions. She asserts, however, that if the trial court erred by failing to include the IRA income, this Court should also conclude that Rule 1910.16-2 applies "to Husband, who regularly bolstered his income with 401(k) withdrawals." Wife's Brief at 25. Wife does not cite any legal authority in support of this position.

The trial court's opinion did not explain why it excluded the distributions from Wife's father's retirement account. We conclude that the court erred in calculating Wife's income for purposes of calculating the amount of Husband's alimony *pendente lite* obligation.

Pennsylvania Rule of Civil Procedure 1910.16-2 defines monthly gross income for purposes of calculating support:

> Monthly gross income is ordinarily based upon at least a six-month average of all of a party's income. The term "income" is defined by the support law, 23 Pa.C.S.A. § 4302, and includes

---

[38] Wife's actual testimony follows: "So it was about $10,000, maybe, one year, and now it's dropped a lot. So it's dependant [*sic*], of course, on the value of the account. So hopefully it doesn't go below that." R.R. at 666a. Wife did not clarify her testimony.

income from any source. The statute lists many types of income including, but not limited to:

(1) wages, salaries, bonuses, fees and commissions;

(2) net income from business or dealings in property;

(3) interest, rents, royalties, and dividends;

(4) pensions and all forms of retirement;

(5) income from an interest in an estate or trust;

(6) Social Security disability benefits, Social Security retirement benefits, temporary and permanent disability benefits, workers' compensation and unemployment compensation;

(7) alimony if, in the discretion of the trier of fact, inclusion of part or all of it is appropriate; and

(8) other entitlements to money or lump sum awards, without regard to source, including lottery winnings, income tax refunds, insurance compensation or settlements; awards and verdicts; and any form of payment due to and collectible by an individual regardless of source.

Pa.R.C.P. 1910.16-2. "In ruling on a claim for alimony *pendente lite*, the court should consider the following factors: the ability of the other party to pay; the separate estate and income of the petitioning party [, *i.e.*, Wife]; and the character, situation, and surroundings of the parties." ***Busse v. Busse***, 921 A.2d 1248, 1255 (Pa. Super. 2007) (citation omitted). In ***Kessler v. Helmick***, 672 A.2d 1380, 1383 (Pa. Super. 1996), the trial court erred by including only the payor's income from his occupation and not income from other sources, as reported in a tax return. ***Kessler***, 672 A.2d at 1383. The other income included interest income, capital gains, and

pension income. *Id.* Thus, this Court remanded to have the trial court recalculate income by including all sources of income. *Id.*

Similar to the trial court in *Kessler*, the trial court here did not include Wife's admitted other source of income: the distributions she receives from an inherited IRA. *See* Pa.R.C.P. 1910.16-2.[39] The court thus failed to consider all of Wife's sources of income. *See Busse*, 921 A.2d at 1255; *Kessler*, 672 A.2d at 1383. We therefore vacate the amount of the award of alimony *pendente lite*, and remand to have the trial court recalculate the amount.[40]

*Life Insurance Policy – Duration of Payment*

We briefly set forth the following as background. Prior to the parties' marriage, Wife quit her part-time job at Husband's suggestion, making Husband the only income earner in the household during the parties' marriage. N.T., 2/25/16, at 401, 415, R.R. at 437a, 451a. Husband did not encourage Wife to find employment prior to their separation. *Id.* at 415-16, R.R. at 451a-52a. The parties entered the prenuptial agreement with the

---

[39] The trial court had previously acknowledged that Wife also supported herself by freely withdrawing from her mother's checking account. Trial Ct. Op., 4/14/16, at 18 n.37. Husband, however, does not argue on appeal that the court should have construed those withdrawals as part of Wife's income.

[40] Wife did not challenge the trial court's calculation of Husband's income on appeal. Thus, she has waived that issue. Also, she failed to cite any legal authority in support of her position that Husband's withdrawal from his retirement account should be considered in calculating the amount of alimony *pendente lite*.

intent to protect Wife. *Id.* at 402, R.R. at 438a. Paragraph 5(e) of the prenuptial agreement provides:

Except as otherwise set forth herein, and in particular with respect to the Plan, the provisions set forth in Paragraph 1.a., and with respect to life insurance on the life of [Husband], as set forth in this Paragraph 5.e., each of the parties agrees that the rights and benefits of each party under any pension, profit sharing, employee benefit or retirement plan, and all insurance on the life of either party, is now and shall continue to be the separate property of the respective parties and is not and shall not become marital property, community property or quasi community property, without regard to where in the world the parties may reside. Notwithstanding the foregoing, the parties hereto contemplate acquiring, from their joint funds, insurance on the life of [Husband] for which [Wife] shall be the owner and primary beneficiary. **Upon termination of the contemplated marriage for any reason** other than upon the death of [Husband], ownership of this policy shall remain with [Wife], but [Husband] shall be excused from any future obligation to pay premiums.

R.R. at 1064a (emphasis added).

According to the trial court, under the prenuptial agreement:

The parties purchased a term life insurance policy in September 2007 from American General Life Insurance Company. The policy indicates husband as the owner and that the death benefit is $500,000. Husband, however, did not transfer ownership thereof to wife as required by the prenuptial agreement.[41] To ensure that the policy would be maintained after separation, [W]ife expended $157.94 per month from April 2010 through December 2015 for a total of $10,900.83.

Trial Ct. Op., 4/14/16, at 15.

---

[41] This statement is inaccurate, as we explain *infra*.

For his last issue, Husband argues that the trial court erred by construing the prenuptial agreement to obligate him to pay, through the date of their divorce, 100% of the premiums on a life insurance policy on his life with Wife as the primary beneficiary. As noted above, our standard of review is to determine whether the trial court made an error of law or abused its discretion. *Laudig*, 624 A.2d at 653.

Husband specifically claims that Paragraph 5(e) of the prenuptial agreement is ambiguous as to the phrase "Upon termination of the contemplated marriage for any reason." Husband's Brief at 13. He contends that his obligation to pay the life insurance premiums terminated on the date of the parties' separation and that the trial court erred in holding that it continues up to the date of their divorce.

As noted above, an agreement is "ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *See Nicholas*, 158 A.3d at 693. Contrary to Husband's argument, we do not agree that "termination of the contemplated marriage" has multiple meanings; rather, the phrase refers to the date when the parties' marriage ends upon entry of a divorce decree. There is nothing in the premarital agreement to suggest that the phrase has a different meaning in the context of Paragraph 5(e). In particular, we do not agree that, as used in Paragraph 5(e), "termination of the contemplated marriage" should be interpreted to refer to the parties' separation, because a

separation does not formally terminate a marriage; if parties can separate, they also can reconcile.  Termination of a marriage does not occur until the court enters a decree of divorce.  *See* 23 Pa.C.S. § 3323(b); *see also* 23 Pa.C.S. § 3504 (statute regarding "disposition of property after termination of marriage," which provides: "whenever a decree of divorce or annulment is entered by a court . . . both parties whose marriage is terminated or affected shall have complete freedom" to dispose of their separate property).

We recognize that there may seem to be a tension between this interpretation of "termination of the contemplated marriage" in Paragraph 5(e) and our earlier interpretation of "term of the marriage" in Paragraph 3(c), but we perceive no inconsistency.  Paragraph 3(c) required Husband to deposit his net income during the "term of the marriage," and we had to construe that requirement in light of the provisions for post-separation support of Wife in Paragraph 4.  Those support obligations applied under Paragraph 4 when "the marital relationship contemplated hereunder, once contracted, shall thereafter no longer be maintained, whether under the provisions of a separation agreement, by reason of separation, divorce, or otherwise."  To give effect to both Paragraphs 3(c) and 4 without conflict, we construed the "term of the marriage" as ending on the date of the parties' separation, thereby preventing post-separation financial support of Wife under both provisions.  But there is no part of the prenuptial agreement that provides us with similar guidance in construing "termination of the

contemplated marriage" in Paragraph 5(e), and, in particular, there is no provision containing language comparable to that in Paragraph 4 to suggest that we should construe "termination" in Paragraph 5(e) to mean separation. The insurance policy contemplated in Paragraph 5(e) was for Wife's benefit, and we therefore construe the agreement to require payment of premiums to maintain the policy until the marriage formally ends.

Husband also contends that we should construe Paragraph 5(e) in a manner consistent with the way the trial court applied Paragraph 1(a) of the prenuptial agreement, which deals with the non-marital portion of Husband's Section 401(k) retirement plan. Paragraph 1(a) states, "In the event of divorce, the increase in the value of the Plan over its value as of the date of the marriage shall be deemed to be marital property to which each party is entitled to a fifty (50.0%) percent share." R.R. at 1055a. Husband points out that when the trial court had to determine the value of the increase under this provision, the court used the date of separation, and not the date of divorce. Husband's Brief at 13. We decline Husband's invitation to apply that same approach to the life insurance premiums.

In addressing the 401(k) issue, the trial court was not asked to construe "termination of the contemplated marriage" or any similar phrase. Rather, because the prenuptial agreement was silent, the trial court was left to divine on what date — date of separation or date of divorce — the plan was to be valued for distribution. *See* Trial Ct. Op., 4/14/16, at 8. Unlike

- 59 -

Paragraph 1(a), Paragraph 5(e) explicitly states that Husband's obligation to pay premiums ends "[u]pon termination of the contemplated marriage." R.R. at 1064a. In light of this language, the trial court did not err in requiring Husband to pay the premiums until the marriage was terminated on the date of divorce. Trial Ct. Op., 4/14/16, at 16.[42]

<u>*Life Insurance Policy – Amount of Payment*</u>

In addition to the duration of his obligation to pay the premiums of the life insurance policy, Husband also challenges the trial court's interpretation of the prenuptial agreement as requiring that he pay 100% of the premiums. Husband's Brief at 14. We restate the disputed passage from Paragraph 5(e) of the agreement:

> [T]he parties hereto contemplate acquiring, from their **joint funds**, insurance on the life of [Husband] for which [Wife] shall be the owner and primary beneficiary. Upon termination of the contemplated marriage for any reason other than upon the death

---

[42] The trial court reasoned that because Husband improperly delayed the divorce trial, it was appropriate to compel Husband to pay. Trial Ct. Op., 4/14/16, at 15. We need not ascertain whether the trial court's rationale was correct because the unambiguous language of the prenuptial agreement obligated Husband to pay until the parties divorced. **Mariner Chestnut**, 152 A.3d at 277 (stating this Court may affirm on any basis). The trial court also stated that Husband was **required** to transfer the life insurance policy to Wife per the prenuptial agreement. Trial Ct. Op., 4/14/16, at 15. It is more accurate to state that Wife, based upon **her** interpretation of Paragraph 5(e), asked Husband to transfer ownership of the policy "immediately." Ex. B to Wife's Pet. to Enforce Life Insurance Provision, 3/27/14 (April 19, 2010 email from Wife's counsel to Husband's counsel). Husband, in response, agreed to maintain the life insurance policy, as set forth in further detail below. Ex. C to Wife's Pet. to Enforce Life Insurance Provision (quoting May 24, 2010 letter).

> of [Husband], ownership of this policy shall remain with [Wife], but [Husband] shall be excused from any future obligation to pay premiums.

R.R. at 1064a (emphasis added).

The parties had purchased the life insurance policy so that if Husband passed away, Wife would have been able to pay off the mortgage on the parties' then-anticipated new marital residence. N.T. Trial, 2/26/16, at 585, R.R. at 620a. As noted above, in anticipation of the parties' marriage, Wife quit her part-time job based on Husband's representation that he would be the sole wage-earner, and she was not employed during the parties' marriage. N.T. Trial, 2/25/16, at 401, 415, R.R. at 437a, 451a.

On appeal, Husband argues that Paragraph 5(e) contemplated that because the premium was to be paid from "joint funds," both parties were to contribute their incomes to the joint account. Thus, Husband reasons, he should not be held solely responsible for the premium payment. Husband's Brief at 14.

In contrast, Wife contends that the prenuptial agreement obligated Husband to pay the premiums. Wife's Brief at 24. Wife notes that after the parties separated, Husband failed to pay the premiums and she therefore was obligated to pay them on her own. *Id.* She contends that the trial court did not abuse its discretion by requiring Husband to repay Wife for the premiums she paid.

We perceive no error of law or abuse of discretion in the trial court's decision. *See Laudig*, 624 A.2d at 653. We may affirm the trial court on any basis. *Mariner Chestnut*, 152 A.3d at 277. In that connection, we note that —

> In the absence of an express [contract] provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.

> Courts employ the doctrine of necessary implication as a means of avoiding injustice by inferring contract provisions that reflect the parties' silent intent. In the absence of an express term, the doctrine of necessary implication may act to imply a requirement necessitated by reason and justice without which the intent of the parties is frustrated.

*Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. 2005) (citations and quotation marks omitted) (affirming trial court's imputation of term into marital settlement agreement preventing the husband from voluntarily reducing his income in order to reduce his alimony payments).

> Thus, where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply it. This is true even where the contract itself is not ambiguous. Since the doctrine of necessary implication serves not to instruct the court as to which of two possible interpretations of a contract should be adopted, but rather to allow the court to enforce the clear intentions of the parties and avoid injustice, the court does not need to find an ambiguity before it will employ the doctrine.

*Slater v. Pearle Vision Center, Inc.*, 546 A.2d 676, 679 (Pa. Super. 1988) (citations omitted). The doctrine supports Husband's obligation to pay the premium here.

Husband contends that the trial court incorrectly based its ruling that he was solely responsible to pay the full amount of the premiums on a May 24, 2010 letter from Husband's prior counsel that acknowledged Husband's "obligation to comply with a prior order of court entered requiring him to pay the premium." Husband's Brief at 14. The letter stated:

> To confirm in writing the matters on which we agree (subject to our agreement as to the percentage of salary and without prejudice to either party at the time of the September[43] hearing). I note that [Husband] does not intend for the below to be independent covenants and, as such, we either have a global agreement or no agreement at all:
>
>        \*     \*     \*
>
> 4. [Husband] will maintain the $500,000 term policy in existence;
>
>        \*     \*     \*
>
> Please let me know if I have misstated anything in this letter when we discuss matters on Wednesday. . . .

Ex. C to Wife's Pet. to Enforce Life Insurance Provision, 3/27/14 (quoting May 24, 2010 letter). Husband asserts that because Judge Gilman vacated

---

[43] Presumably, this was in reference to Judge DiSalle's May 19, 2010 order granting Wife's petition to enforce Paragraph 3(c), which stated that both parties must contribute their net income to a joint account pending a hearing scheduled for September 2010. Order, 5/19/10.

Judge DiSalle's prior orders, the court abused its discretion by relying on this letter to require him to pay, since the letter was prompted by Judge DiSalle's now-vacated court order. Husband's Brief at 14.[44]

Initially, we conclude that Husband misstates both the letter and the reason for Judge Gilman's reliance on it. The letter does not state or otherwise assert that Husband was ordered by Judge DiSalle to pay the premium, and Judge Gilman never said Husband's obligation to pay premiums stemmed from any "prior order of the court." Rather, the court stated: "According to a letter dated May 24, 2010 from [H]usband's attorney to [W]ife's attorney, . . . [H]usband acknowledges that he will maintain the life insurance policy." Trial Ct. Op., 4/14/16, at 16.

We also disagree with Husband's interpretation of the prenuptial agreement on this issue. Paragraph 5(e) states that "the parties hereto contemplate acquiring, from their joint funds, insurance on the life of" Husband. R.R. at 1064a.[45] Paragraph 5(e) does not specify which party would actually pay or in what amount; the prenuptial agreement is silent on this issue.

But the prenuptial agreement does acknowledge that upon termination of the parties' marriage, Husband was "excused from any future obligation

---

[44] Husband does not argue on appeal that there was no "global agreement."

[45] Because a life insurance policy exists, we do not examine whether the parties were obligated to acquire one. The prenuptial agreement states that the parties "contemplate acquiring."

to pay premiums." R.R. at 1064a. Because Husband was the sole wage earner, the necessary implication is that the agreement obligated Husband to pay for 100% of the premium, notwithstanding that the source of the payment was the parties' joint account. *See Stamerro*, 889 A.2d at 1259; *Slater*, 546 A.2d at 679. This is particularly true because Husband did not object to being the sole wage earner. R.R. at 451a-52a. Thus, separate and apart from any reliance the trial court may have placed on the May 24, 2010 letter in obligating Husband to pay 100% of the premiums, we conclude that it was proper to recognize that the prenuptial agreement necessarily implied such an obligation. *See Stamerro*, 889 A.2d at 1259; *Slater*, 546 A.2d at 679. The agreement did not create any obligation to pay for the premiums out of joint funds and it therefore did not obligate Wife to share the payment obligation. We therefore conclude that Husband is entitled to no relief on this issue.

**Conclusion**

For the foregoing reasons, we affirm the decree granting the parties' divorce, and affirm the April 14, 2016 order in part, reverse it in part, and vacate that order in part. Because the trial court erred by holding that the $64,032.21 Custom Homes judgment was solely Wife's non-marital debt, and not a marital debt, the court must include that judgment as part of the marital estate and equitably re-divide the marital estate in accordance with the factors set forth in the Divorce Code. We vacate the amount of the

award of alimony *pendente lite* and remand to have the court recalculate the amount because the court erred by not including the distributions Wife received from the retirement account she inherited from her father. The trial court must also reconsider Wife's request for equitable reimbursement; nothing within our decision precludes the trial court from again denying Wife's request for equitable reimbursement if it deems that result appropriate, but it should thoroughly discuss the Section 3502(a) factors. We remand for further proceedings in accordance with this decision.

Motion to substitute amended second brief for Wife granted. Motion to amend certified record granted. Decree granting divorce affirmed. Order dated April 14, 2016, affirmed in part, reversed in part, and vacated in part. In future filings that reference this Court's memorandum, the parties shall attach a copy of the trial court's April 14, 2016 opinion. Case remanded for further proceedings. Jurisdiction relinquished.

Judge Lazarus joins the memorandum.

Judge Strassburger files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2017

- 66 -

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY PENNSYLVANIA
CIVIL DIVISION

BRUCE I GOLDBLATT )
    Plaintiff )
     )
     )
v )    No    2010 - 3177
     )
JANE D YOUNG )
    Defendant )

## OPINION

The parties Bruce Goldblatt ( husband,' age 62 at the time of trial), and Jane Young ( wife.' age 58 at the time of trial) married on October 24, 2006 For each. this was their second marriage and no children were born therefrom [1] They separated on April 2. 2010 when husband left the marital residence Husband filed a divorce complaint on April 28, 2010 in the Washington County Court of Common Pleas The complaint contained just one count which was for a divorce from wife On May 14. 2010 wife filed an answer and counterclaim, which included requests for alimony *pendente lite* ( A P L ), alimony. equitable distribution of marital property enforcement of a prenuptial agreement. and injunctive relief [2] The Court held a four-day trial on the issues starting on February 23. 2016

There has been protracted litigation regarding these divorce claims as well as claims ancillary to the divorce Throughout the proceedings. there have been voluminous petitions for

---

[1] Husband has three children from his first marriage, wife has one child from her first marriage All children are emancipated

[2] The parties signed a document titled Amended Prenuptial Agreement' on December 15, 2006 almost two months after the marriage *See* Joint Exhibit 1 The original prenuptial agreement was never testified to nor introduced into evidence However it is self-evident that such document existed based upon the language in the first paragraph of the Amended Prenuptial Agreement s preamble The Amended Prenuptial Agreement will be referred to hereinafter as the prenuptial agreement

contempt of court orders and /or the enforcement of discovery requests Most of these contempt and enforcement proceedings were the result of husband's behavior or failure to comply with the payment of support or discovery requests Accordingly, wife incurred attorney fees to enforce the Court s orders and her claims were stalled as a result of husband's contemptuous behavior Specifically, ten court orders were issued against husband for failing to comply with discovery matters [3] As a result wife had been awarded $30 981 89 in counsel fees through February 23, 2016 due to husband s failure to comply with discovery requests or to pay support as ordered [4] *See* Joint Exhibit 1 Stipulation at ¶ 31

On May 19 2010. wife s counsel presented to Judge John DiSalle a Petition to Enforce to compel husband to deposit his entire paycheck into the parties' joint checking account The Court scheduled a hearing on the request that was set for September 24 2010 Judge DiSalle issued an order on October 19 2010 granting wife s petition The Court required husband to deposit his entire paycheck into the parties' joint account and instructed that [husband] shall not make any withdrawals or transactions from the account absent any agreement by the parties Two weeks later on November 1. 2010. husband filed a Chapter 13 bankruptcy petition. which wife did not join [5]

The U S Bankruptcy Court dismissed husband s petition because it had no merit Husband. thereafter. filed a second Chapter 13 bankruptcy petition on December 15, 2010 that wife did not join The proceeding was converted to a Chapter 11 proceeding Again, the U S Bankruptcy Court dismissed the petition because it had no merit All divorce proceedings were

---

[3] These orders were issued on May 4, 2011, May 26, 2011 July 14, 2011, August 3, 2012, October 25, 2012 March 27, 2014, June 2, 2014 October 3, 2014 August 19 2015 and October 27, 2015 The Court notes that there were also occasions that wife had to file motions to enforce compliance with the prenuptial agreement i e to enforce the life insurance provisions

[4] In addition the Court issued several orders sanctioning husband but deferred the imposition of attorney fees on those orders until equitable distribution

[5] Husband s Suggestion of Bankruptcy notice was filed with the Court of Common Pleas on November 22, 2010

2

halted for four months due to the automatic stays in place pending dismissal of husband's bankruptcy cases. Husband explained that filing the bankruptcies was at "the advice of counsel" but did not elaborate. This Court believes the bankruptcy petitions were filed, in part, to relieve husband's financial obligation that Judge DiSalle had imposed upon him.

Another reason for the delay in the divorce proceedings concerned a residence located on Dyers Stone Drive in Nottingham Township, Washington County. When the parties married, husband sold his home and moved into wife's premarital residence located on Arrowhead Lane, Eighty Four, Pennsylvania. According to the prenuptial agreement, however, wife was to sell her Arrowhead Lane residence and use those proceeds to purchase a marital residence for the parties. The new home was to be titled in her name only and any appreciation in value was to remain wife's separate property. Wife contracted with Custom Homes following the marriage to construct the new home on Dyers Stone Drive. During the construction process, the parties noticed that the walls were cracking and that drywall nails were popping from the drywall.[6] These problems led to wife filing two lawsuits.[7] Believing that one of the lawsuits, the Codesys

---

[6] The home was already bricked at this juncture, some floors had been tiled and dry wall had been put on the studs. Plaster had not yet been smeared to cover nail heads and no cabinetry or appliances had been installed. As wife testified, the home was about two-thirds complete when the builder was fired. The parties stipulated that the cost to stabilize the subsidence and to make the necessary repairs to the home would be between $425,000 and $475,000. Further the cost to then complete the house would be between $300,000 and $350,000. Based upon same, the total estimated cost of complete remediation is between $725,000 and $825,000. Therefore, this 'leaves Dyers Stone with a fair market value as is of between $100,000 and $200,000, without considering the expenditure of $104,904.55 in counsel fees thus far. *See* Stipulation, Joint Exhibit 1, ¶ 22.

[7] Initially, husband and wife were sued by their builder, Custom Homes, Inc. in Allegheny County for wrongful termination (husband testified that wife decided that the builder should be fired, wife testified that this was a joint decision). According to wife, she was served with process on July 31, 2009. After an arbitration hearing, a judgment in the amount of $64,032.21 was entered against husband and wife at Docket # GD-10-21463. Husband testified during the divorce proceedings that he did not participate in the Custom Homes litigation strategy. He claimed that he was a named plaintiff because his name was on the deed to the property.

On May 1, 2010, wife filed a complaint against Codesys in Allegheny County with respect to the Dyers Stone Drive property. Codesys was the company hired to perform 'inspections on the Property during the course of the project. Wife alleged that Codesys 'failed to review the Property and permitted construction to move forward despite a defective foundation.' *See Jane Young v Codesys*, GD-12-5436 (Complaint, ¶¶ 20, 21) After many continuances the Court of Common Pleas has set the trial for the first week of September 2016. Wife has also sued her counsel who represented her in the case that she defended against Custom Homes. *See Jane Young v John Lippl*, GD-12-19194.

3

lawsuit should be litigated before the divorce trial, wife filed requests to continue the scheduling of the trial four separate times [8] Eventually, this Court would not grant any further continuances In addition wife caused some delay in the divorce proceedings for failing to comply with husband s discovery requests The Court sanctioned wife three times [9]

Most of the divorce proceeding focused on the parties prenuptial agreement specifically paragraph 3(c) As aforementioned Judge DiSalle held a hearing on September 14 2010 regarding wife s claim for support On October 18, 2010, he concluded that this paragraph of the prenuptial agreement imposed a duty upon husband to deposit 100% of his income into the parties' joint account On May 23, 2011, Judge DiSalle modified that order and directed husband to deposit 50% of his income in to the joint account After the case was transferred to the undersigned in January 2012 husband filed an Omnibus Motion on January 4, 2013 to reconsider Judge DiSalle s decisions on this matter On February 1 2013, the undersigned issued an order and opinion granting husband s request A supplemental opinion was issued on September 3 2013 when wife filed a request for reconsideration Both opinions are incorporated herein as if specifically set forth

A second issue concerning paragraph 3(c) of the prenuptial agreement concentrated on the Dyers Stone Drive property A substantial portion of the divorce trial was devoted to this matter Paragraph 3(c) of the prenuptial agreement states

> It is hereby acknowledged that as of the date of this Agreement, Jane is the owner of her personal residence located at 253 Arrowhead Lane, Eight[sic] Four, PA Said residence is fully paid, encumbered by no mortgage debt having an approximate value on the date of this Agreement of $400 000 00 Both Bruce and Jane acknowledge that this residence is the non-marital property of Jane and in this regard, Bruce specifically acknowledges that he waives any and all right, title and interest he may have by virtue of his marriage to Jane in her personal residence, or the proceeds therefrom, however invested or titled The parties

---

[8] The Court also granted wife s request to postpone the trial on October 27, 2015 due to medical problems
[9] These sanctions were on December 30, 2014, April 23 2015 and October 27, 2015

4

acknowledge that following the contemplated marriage, Jane will sell her personal residence and utilize a portion of the proceeds therefrom to acquire a new marital residence for the parties. The amount of the proceeds that Jane will invest in the new marital residence along with all equity and appreciation in the new marital residence shall remain Jane's non-marital property. The new marital residence shall be titled in Jane's name, but shall be subject to the terms and conditions set forth in this Agreement. The parties shall cooperate to obtain mortgage documents, if required. If required by the lending institution the property shall be titled in joint names, as tenants by the entireties, but shall remain subject to the terms and condition set forth in this Agreement.

Wife did not have sufficient funds to build the Dyers Stone Drive home, so she applied for a mortgage with Washington Financial. Wife was unable to qualify for a mortgage on her own—Washington Financial obligated husband to co-sign the mortgage and promissory note and required that his name be on the deed.[10] The parties do not dispute that the Dyers Stone Drive residence is wife's separate property and that any increase in value is to be hers as well. What is disputed is whether husband is responsible for any portion of the mortgage related thereto. Both parties acknowledged on the record that the above paragraph in the prenuptial agreement is silent on the matter.

Husband accepts that he has a contractual liability with the bank, but contends that he has no such liability within the context of the prenuptial agreement. Husband argues that he was 'required" under the terms of the prenuptial agreement to co-sign the mortgage and note so that wife would qualify. Further, his name appears on the deed only because the bank required it, the prenuptial agreement recognizes this fact as immaterial to any claim husband may have to the property. This, husband contends, is evidence of the parties' intent that the debt also be wife's responsibility. Moreover, husband signed a separate waiver of spousal interest acknowledging that his signature on the deed of Dyers Stone Drive had no effect upon the parties' prenuptial agreement that the property was to be wife's non-marital property. *See* Exhibit 8.

---

[10] Wife's Arrowhead Lane residence secured the note. The parties borrowed $623,200.

5

Conversely. wife testified during the divorce trial that husband always held himself out as a person liable on the note Wife claimed husband took interest in the design and building of the home and that he often communicated with the builder about the progress or lack thereof In addition. wife testified that husband selected the attorney to defend them in the lawsuit filed by the builder, Custom Homes, Inc . for wrongful termination [11] Most importantly wife argues that because paragraph 3(c) of the prenuptial agreement is silent on the matter, the Court must adjudicate the issue based upon the divorce code, which would make the debt a marital obligation since it was incurred during the marriage

The Court finds that the mortgage on the Dyers Stone Drive property is wife's separate debt This finding is based upon the language of the prenuptial agreement itself According to paragraph 6, `[e]xcept as otherwise expressly provided herein neither party. nor his or her property shall be held liable for or subject to the debts of or the claims against the other party, whether such debts or claims be acquired prior to or during the marriage of the parties " *See* Joint Exhibit 1. Amended Prenuptial Agreement The parties acknowledged on the record, and wife in her pre-trial statement, that paragraph 3(c) of the prenuptial agreement is silent as to the apportionment of the liability between the parties but that Dyers Stone Drive is wife's separate property The Court therefore. must conclude that wife is responsible for the associated debt, to find otherwise would render paragraph 6 meaningless And as previously noted. husband only signed the mortgage note because wife was unable to qualify on her own Pursuant to the terms of the prenuptial agreement, husband was required to cooperate to obtain mortgage documents

---

[11] *See supra* note 7 On May 5 2011, the builder filed an action in Washington County, Pennsylvania (CV-2011-3052) to register and enforce the judgment The judgment remains unsatisfied

*Id* at ¶ 3(c) For the same reason the Court finds that the $64 032 21 judgment in connection with the Dyers Stone Drive residence shall also be wife s liability alone [12]

The only asset to be divided by the Court is husband s Individual Retirement Account (" IRA") According to the prenuptial agreement, [i]n the event of divorce, the increase in value of the Plan over its value as of the date of the marriage shall be deemed to be marital property to which each party is entitled to a fifty (50 0%) percent share " *See* Joint Exhibit 1 Amended Prenuptial Agreement, ¶ 1 The parties however disagree on the increased value First, husband claims that the increase in value should only be until the date of separation since it represents the lesser increase in value of his separate asset 23 Pa C S A § 3501 (a 1) Second and alternatively, he argues that the date of divorce value should not be considered because wife caused many delays in scheduling the trial In contrast wife argues that the IRA must be valued on the date of divorce because the prenuptial agreement states " in the event of a divorce " and

---

[12] During the divorce trial wife introduced exhibits of loans she has taken from her mother, KiKi Doumas ( mother ) *See* Exhibits M N Wife testified that these loans were for the building of the Dyers Stone Drive home wife s post-separation support, and wife s counsel fees incurred for the five court cases involving Dyers Stone Drive construction issues The first set of loans was issued between March 30, 2008 and December 5 2008 (December 5 2008 note) for the purpose of purchasing the lot, closing costs the deposit for Custom Homes, and extras' beyond builder allowances *See* Exhibit K, L No loans were issued in 2009 but additional loans were issued in 2010 through 2016 *Id* Trial Aide 'Loan to Jane Young 3-10-08 through 8-21-13 These loans total $1,138,757 54 The first set of loans ($214 330 86), however, was not recorded

Unable to collect its judgment against husband and wife Custom Homes sued wife and mother in the Washington County Court of Common Pleas at CV-2011-3052 Custom Homes alleged that the above recorded loans which were secured by wife's real property, were fraudulent transactions made solely to defraud a creditor *See Custom Homes v Jane Young and KiKi Doumas*, CV-2012-2460 The Court (President Judge Katherine B Emery) ruled that Custom Homes proved a prima facie case that fraudulent transfers took place and that communications between the actors involved are therefore not privileged Wife filed an interlocutory appeal to the Superior Court, which was quashed

Mother testified that she expected husband to repay the loans issued from March 30, 2008 through December 5 2008 However, husband did not enter into these written loans, only wife appeared thereon *See* Exhibit M Assuming the December 5, 2008 note was truly issued on that date this is evidence that wife expected and understood that debt associated with Dyers Stone Drive was not marital debt This supports the Court's conclusion On the other hand, the note is not recorded This is evidence that the note was issued substantially after December 5 2008, i e, after husband and wife were sued by Custom Homes, to demonstrate a consistent pattern of lending from the outset and to legitimize the recorded loans issued on and after November 17, 2010 Under either scenario, wife s credibility is seriously impeached when claiming that the mortgage is a joint debt and that the $1,138,757 54 is comprised of loans Certainly, if wife recovers in her cases against Codesys and Lippl, she may repay mother for litigation expenses But, the Court does not believe that wife will repay mother if the litigation is unsuccessful nor will there be a repayment for living expenses, home extras, the cost of the lot or closing costs

7

does not suggest any other time period in relation to this asset Specifically, wife stresses that the prenuptial agreement does not use the words ' in the event of a separation ' *Id* Further, wife testified that the prenuptial agreement was drafted to protect her and thus the date of divorce value should be used

The Court concludes that the prenuptial agreement only mentions when husband's asset is to be divided it is to be divided at the time of divorce instead of separation The agreement does not discuss how the asset is to be valued for distribution Therefore, the intent of the parties must be explored because "the cardinal rule in interpretation of contracts is to ascertain intention of parties and give effect to that intention if it can be done consistently with legal principles ' *Scranton Housing Authority v City of Scranton*, 284 A 2d 148 151 (Pa Cmmw Ct 1971)

The Court finds that the agreement was drafted to protect both parties, not just wife Although many of the terms of the agreement favor wife (i e the equity in Dyers Stone Drive is all wife s, and only wife may file for support A P L , and alimony), there are terms protecting husband s interests as well For instance, the equity in his premarital residence was not required to be used toward the purchase of the parties new home [13] That the prenuptial agreement protects both parties does not however, reflect upon the specific issue of how to value the increase in husband s IRA Neither party presented relevant testimony regarding their intentions on this subject Under these circumstances the applicable statutes and case law must determine the 'increase in value of the Plan' subject to equitable distribution *See Rullo v Rullo*, 18 Pa D & C 4th 636, 639 (1993) (where the marriage settlement agreement is silent on the issue of payment of unreimbursed medical expenses the issue is open to consideration by the court

---

[13] ' [T]he personal residence of [husband] is to be liquidated shortly following the date of the marriage and the net proceeds therefore, approximately $50,000 00, shall remain the separate non-marital property of [husband], regardless of choice of investment or location of asset ' *See* Amended Prenuptial Agreement, Joint Exhibit 1, p 7

8

pursuant to the Support Code) Accordingly, the Court will use the date of separation, not the date of divorce, to determine the increase in value of husband's IRA for equitable distribution

The prenuptial agreement states that the account value as of an attached statement dated October 26, 2006 was "$345,000 00 vested balance $320 000 00 " *See* Amended Prenuptial Agreement Joint Exhibit 1 (Exhibit B therein) Wife testified that she did not see Exhibit 'B' before signing the agreement Exhibit ' B' was not attached to the prenuptial agreement and neither party introduced it as evidence at the trial Wife introduced an exhibit from husband s IRA plan that provided $304,533 42 of vested value as of October 1, 2006 *See* Exhibit C Effectively, wife would like the Court to use $304,533 42 instead of $320 000 00 as the date of marriage value

Generally, the parties are bound by their agreements absent fraud, misrepresentation or duress They are bound "without regard to whether the terms were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains " *Sabad v Fessenden*, 825 A 2d 682, 688 (Pa Super Ct 2003) (quoting *Simeone v Simeone*, 581 A 2d 162, 165 (Pa 1990)) The Court declines to rewrite the parties' agreement because it does not find any misrepresentation Far be it for the Court to conclude that an investment asset could not increase in value from $304 533 42 to $320 000 00 in almost one month [14] The following calculation for the division of husband s IRA is being employed

|  |  |
|---|---|
| $355 338 | 401(k) value as of 4/1/10.[15] less |
| ($320,000) | Premarital value as of the date of marriage |
| $35 338 | Total increase during marriage |

Wife s share = 50% of $35,338 = $17,669

---

[14] In 2006 the Dow Jones Industrial Average increased a healthy 16 29% from January 1 to December 31 The increase from $304 533 02 to $320,000 00 is 4 8%

[15] Value of 401(k) one day prior to separation, as stipulated by the parties *See* Joint Exhibit 1, ¶ 28

9

Wife's claim for A P L shall be from the inception of the divorce complaint and be calculated as follows

| Type | 2010[16] Husband | Wife | 2011[17] Husband | Wife | 2012[18] Husband | Wife |
|---|---|---|---|---|---|---|
| Gross Income | 132 836 | 15 080[19] | 141 542 | 15 080 | 34,189[20] | 15 080 |
| Local Income Tax | (1,328) | (151) | (1 415) | (151) | (84) | (151) |
| State Income Tax | (4 078) | (463) | (4 345) | (463) | (259) | (463) |
| Social Security | (6 621) | (219) | (6 621) | (219) | (523) | (219) |
| Medicare | (1,926) | (935) | (2 052) | (935) | (122) | (935) |
| Fed Income Tax Filing M S 1 exemption | (29,641) | 0[21] | (32 301) | 0 | (3,246) | 0 |
| Total Net Income | $89 242 | $13,312 | $94 808 | $13 312 | $29,955 | $13 312 |
| Net Income Per Month | $7,437 | $1,109 | $7,901 | $1,109 | $2,496 | $1,109 |

---

[16] *See* Exhibit 6

[17] *See* Exhibit 5

[18] *See* Exhibit 4

[19] Despite that fact that wife claims she has anxiety and is depressed and therefore cannot work, minimum wages are being imputed to her At trial, wife's testimony was articulate and she testified that she works approximately 120 hours per week on her lawsuits

[20] The $34 189 of gross income consists of $8,432 of income and $25,757 of unemployment compensation The local income tax, state income tax, social security, and medicare amounts are derived from earned income only The Court finds that husband based upon his testimony, was making reasonable efforts to find employment in his chosen field of expertise Therefore, he will not be imputed additional income during the years of 2012 and 2013 Husband lost his job at Dentsply through no fault of his own He was able to find similar employment in September 2013 with TP Orthodontics He was fired from TP Orthodontics on April 17, 2015

[21] Wife would itemize her deductions with $28,615 in mortgage interest and at least $6 769 (Dyers Stone Drive property) in real estate taxes *See* Exhibit 6 Further, wife can deduct her interest on her Arrowhead Lane property

10

|  | 2013[22] | | 2014[23] | | 2015 | |
| --- | --- | --- | --- | --- | --- | --- |
| **Type** | *Husband* | *Wife* | *Husband* | *Wife* | *Husband* | *Wife* |
| Gross Income | 41,061[24] | 15,080 | 87,722 | 15,080 | 87,764[25] | 15,080 |
| Local Income Tax | (395) | (151) | (877) | (151) | (877) | (151) |
| State Income Tax | (1,212) | (463) | (2,693) | (463) | (2,693) | (463) |
| Social Security | (573) | (219) | (5,439) | (219) | (5,439) | (219) |
| Medicare | (2,449) | (935) | (1,272) | (935) | (1,272) | (935) |
| Fed Income Tax Filing M S 1 exemption | (4,212) | 0 | (15,249) | 0 | (15,149) | 0 |
| Total Net Income | $32,220 | $13,312 | $62,192 | $13,312 | $62,334 | $13,312 |
| Net Income Per Month | **$2,685** | **$1,109** | **$5,183** | **$1,109** | **$5,195** | **$1,109** |

|  | Husband's A P L Obligation | |
| --- | --- | --- |
| **Effective Date** | *Per Month* | *Per Year* |
| May 14, 2010 | 2,531 | 19,305 |
| January 1 2011 | 2,717 | 32,604 |
| January 1, 2012 | 555 | 6,660 |
| January 1 2013 | 630 | 7,560 |
| January 1 2014 | 1,629 | 19,548 |
| January 1, 2015 | 1,634 | 19,608 |
| January 1 through March 2016[26] | 1,634 | 4,902 |
| **TOTAL** | | **$110,187** |

[22] *See* Exhibit 3

[23] *See* Exhibit 2

[24] The $41,061 of gross income consists of $39,495 of income and $1,566 of unemployment compensation. The local income tax state income tax, social security, and Medicare amounts are derived from earned income only

[25] Shortly before turning 62, husband lost his job with TP Orthodontics Husband was fired, but he has filed a claim for wrongful termination When he turned 62, husband stopped looking for work in his chosen profession and decided to retire Husband is being imputed this TP Orthodontic income because he was terminated for cause and because he acknowledged that he would most likely go back to work if a job were offered to him

[26] The A P L will be charged through March 2016 Husband argued that this obligation should be terminated after three and one-half years since the marriage lasted only three and one-half years Pa R C P 1910 16-1(C)(2) Support orders, however are effective from the date of filing Pa R C P 1910 16-7(a) Husband has not filed a petition to modify/terminate Therefore the Court is unable to consider his request

11

In addition to the above A P L , husband shall pay his proportionate share of wife s medical insurance premiums and his proportionate share of wife's unreimbursed medical expenses that exceed $250 annually

| Medical Insurance Premiums | | | |
|---|---|---|---|
| Date | Amount Wife Paid | Husband's Share (%) | Amount Husband to Reimburse |
| July - December 2011[27] | 3,532 | 88% | 3,108 |
| 2012 | 5,799 | 69% | 4,001 |
| 2013[28] | 3,718 | 71% | 2,640 |
| 2014 | 3,837 | 82% | 3,146 |
| 2015 | 4,749 | 82% | 3 894 |
| January - March, 2016 | 1,295 | 82% | 1 061 |
| TOTAL | | | $17,851 |

| Medical Expenses[29] | | | |
|---|---|---|---|
| Date | Amount Wife Paid | Husband's Share (%) | Amount Husband to Reimburse |
| 2010 | 269 | 87% | 17 |
| 2011 | 1 115 | 88% | 761 |
| 2012 | 611 | 69% | 249 |
| 2013 | 1 988 | 71% | 1 234 |
| 2014 | 1 320 | 82% | 877 |
| 2015 | 3,068 | 82% | 2 311 |
| TOTAL | | | $5,449 |

The above amounts for A P L , medical insurance premiums and medical expenses total $133,487 The parties stipulated that husband has paid $84 056 38 in support payments directly to wife Further husband has paid $12 676 12 to PACSES at the Domestic Relations Office as of March 4 2016 After these credits husband would owe wife $36 754 50

---

[27] In 2011, husband lost his job with Dentsply Therefore wife was required to purchase medical insurance through COBRA which she did for 2011 and 2012

[28] In 2013, COBRA coverage was no longer available, so wife purchased her own medical insurance plan

[29] Pursuant to Pennsylvania Rules of Civil Procedure 1910 16-6 (c)(1), husband must pay his proportionate share of wife s unreimbursed medical expenses above an annual $250 threshold

Husband argued that A P L should not be any longer than the years of the marriage *See* Pa R C P 1910 16-1(c)(2) The Court extended A P L to the date of the trial because husband caused some of the delay in the scheduling of the trial itself (as set forth above. husband filed bankruptcies that had no merit and he was not cooperative in the discovery process) and because he never filed a petition to modify Further. the Court is not imposing A P L if wife files an appeal nor is alimony being granted

Wife filed a claim for alimony but did not present testimony or argument in support of the claim In addition wife did not mention the request for alimony in her pre-trial statement Even if wife had testified as to alimony. this Court is not inclined to grant alimony pursuant to 23 Pa C S A § 3701(b) The Court ordered husband to pay five years of A P L , a year and one-half longer than the length of the marriage Wife also owns the home in which she lives (the Arrowhead Lane property) it is mortgage free and had a value of $400,000 ten years ago when the parties entered into their prenuptial agreement[30] Certainly. the earning capacities of the parties favors husband and the Court recognizes that wife has a substantial mortgage on the Dyers Stone Drive property with Washington Financial, which costs $2.673 80 monthly[31] And. the relative needs of the parties weigh in wife s favor since she is litigating multiple cases to resolve the issues surrounding the Dyers Stone Drive property which were unforeseen at the time the parties entered into their agreement[32] However, this matter concerns a non-marital debt according to the prenuptial agreement and parties are free to enter bad bargains Consideration of the reasonableness of their bargain is inappropriate *See Simeone v Simeone.* 581 A 2d 162, 165 (Pa 1990) '[E]veryone who enters a long-term agreement knows that circumstances can change

---

[30] Wife testified that her Arrowhead Lane home is 4 000 square feet on the nicest block in the neighborhood Husband does not own a home, he rents a two-bedroom apartment for $1,700 per month

[31] The parties stipulated that the balance of the mortgage is $506 398 40 as of January 25, 2016 *See* Joint Exhibit I

[32] Wife testified that she has expended $104,904 55 in counsel fees to pursue claims against Codesys and John Lippl to date *See* Exhibit P

13

during its term, so that what initially appeared desirable might prove to be an unfavorable bargain Such are the risks that contracting parties routinely assume *Id* at 166

As for the parties' lifestyle they lived a comfortable upper middle class life This Court concludes that both parties also lived a comfortable lifestyle before they married [33] Wife afforded and maintained a $400,000 home purchased in 2001 (which was mortgage free in October 2006 when the parties entered into their prenuptial agreement) on an income that never reached $10,000 annually The Court believes wife was able to do so because she was a joint holder with her mother on a substantial checking account with Citizens Bank

Wife testified on direct examination that her mother loaned her money from the joint Citizens Bank account for "extras" for the construction of the Dyers Stone Drive home, as well as for post-separation living expenses and counsel fees Wife claimed she did not know the account existed until 2008 when the Dyers Stone Drive home construction started On cross-examination, however wife was presented with Exhibit 'A from the prenuptial agreement In that agreement, wife disclosed that said account ' exceeds $200 000 " *See* Joint Exhibit I (Exhibit 'A therein) The Court concludes that not only did wife know about the account at least two years earlier, she did not disclose an approximate value For these reasons, this Court did not find wife's testimony credible and believes she has had access to this substantial checking account to support her lifestyle since before meeting husband [34] Accordingly the Court denies wife's claim for alimony

---

[33] Wife was previously married but divorced in 1993

[34] *See also supra* note 12 (this Court does not believe wife will repay her mother) Furthermore, the prenuptial agreement imposed a duty upon wife to sell her Arrowhead Lane residence and to use a portion of the proceeds therefrom to fund the purchase of a new residence Wife, however did not sell her Arrowhead Lane residence The Court finds that this fact lends support to the conclusion that wife had ready access to the Citizens Bank account as well as other accounts of mother

14

The next issue to tackle concerns a life insurance policy. The prenuptial agreement includes a clause regarding the purchase of life insurance. Specifically, the agreement states the following:

> [T]he parties contemplate acquiring, from joint funds, insurance on the life of [husband] for which [wife] shall be the owner and primary beneficiary. Upon the termination of the contemplated marriage for any reason other than upon the death of [husband] ownership of this policy shall remain with [wife], but [husband] shall be excused from any future obligation to pay premiums.

*See* Exhibit 1, Amended Prenuptial Agreement, ¶ 5(e)

The parties purchased a term life insurance policy in September 2007 from American General Life Insurance Company. The policy indicates husband as the owner and that the death benefit is $500,000. Husband, however, did not transfer ownership thereof to wife as required by the prenuptial agreement. To ensure that the policy would be maintained after separation, wife expended $157.94 per month from April 2010 through December 2015 for a total of $10,900.83. *See* Exhibit Q, Trial Aide, 'Life Insurance Premiums from DOS through 12-31-15'

Husband contends that he should not be responsible for all of these premium payments since wife caused delay of the trial. Wife did make such requests but the Court found reason to grant them. In addition, husband was culpable for delaying the trial due to filing two meritless bankruptcies and not complying with many discovery requests. Therefore, the obligation to repay life insurance policy premiums is imposed on husband. With respect to the amount to be repaid by husband, paragraph 5(e) of the prenuptial agreement states that payment shall come from 'joint funds.' The agreement also states that after the parties marry they both 'shall contribute their entire net income to a joint account or accounts, to be utilized for household and living expenses of the parties during the term of the marriage. The parties acknowledge that their contributions to this account or accounts shall not be equal.' *See* Joint Exhibit 1, Amended

15

Prenuptial Agreement ¶3 (c) Therefore, it could be argued that the premium payments should be apportioned based upon the parties income or earning capacities According to a letter dated May 24 2010 from husband's attorney to wife s attorney, however husband acknowledges that he will maintain the life insurance policy *See* Petition to Enforce Insurance Provision filed March 27, 2014 Therefore, husband will be charged the entire sum of the premiums which equals $157 94 per month *See* Exhibit Q Wife paid $10,900 83 through 2015 *Id* The Court will add an additional four months for the year 2016 or $631 76 for a total of $11 532 59

Wife argued that the Court should impose an award of equitable reimbursement Equitable reimbursement is a remedy where it is necessary to produce an equitable result when the marital estate is insufficient to achieve fairness *Wang v Feng* 888 A 2d 882 888 (Pa Super Ct 2005) Specifically it may be awarded when one spouse s contributions to the "education training or increased earning capacity of the other spouse exceeds the bare minimum legally obligated support as reflected in the [support] guidelines " *Bold v Bold*, 574 A 2d 552, 556 (Pa 1990) The Courts have also permitted equitable reimbursement in the form of alimony where fairness requires the repayment of a certain marital debt *Zullo v Zullo*, 613 A 2d 544, 546 (Pa 1992)

This Court does not find the same circumstances as those found in *Wang, Bold*, and *Zullo* The parties entered into a prenuptial agreement that delineates the non-marital assets, the marital assets, and the distribution regarding same Additionally there was no evidence that wife contributed to husband s education or increased earning power during the marriage Finally, this Court has concluded that the mortgage debt on the Dyers Stone Drive property and the $64,032 21 judgment related thereto are solely wife's debts, husband will not be repaying wife on a marital debt Therefore, wife's request is denied

16

The final issue for the Court to address is attorney fees Counsel fees are awarded to promote fair administration of justice by enabling the dependent spouse to maintain or defend the divorce action without being placed at a financial disadvantage, the parties must be "on par with each other" *Busse v Busse*, 921 A 2d 1248, 1258 (Pa Super Ct 2007) The decision to make an award is on a case-by-case basis after reviewing relevant factors These factors include the payor s ability to pay, the financial resources of the requesting party the size of the estate, the value of the services rendered the property received in equitable distribution and whether the conduct of one of the parties protracted the litigation and increased the expenses of the proceeding *Gates v Gates*, 933 A 2d 102, 109 (Pa Super Ct 2007), *Jacobs v Jacobs*, 884 A 2d 301 307 (Pa Super Ct 2005), *Adelstein v Adelstein*, 553 A 2d 436, 437 (Pa Super Ct 1989)

As of the date of trial, the Court had required husband to pay $30,981 89 in counsel fees due to his obdurate and vexatious behavior *See* Joint Exhibit 1, Stipulation, ¶ 31 Wife requests that husband reimburse her for all of her counsel fees in this divorce proceeding which total $183 853 15, plus an additional $3 440 00 in expert fees as well as those she incurred in defending her claims in husband s two bankruptcy proceedings and the two Custom Home cases [35] With respect to the bankruptcies and Custom Home cases this Court is unaware of case law that permits a court to order a party in a divorce action to pay for counsel fees in a separate proceeding Indeed wife did not provide any supporting case law It is true, however, that there are several outstanding orders herein (June 22 2011 July 14 2011, October 3 2014) stating that wife's request for additional counsel fees due to husband s contemptuous behavior would be addressed at the equitable distribution trial With this in mind the Court will order an additional $3 000

---

[35] These fees do not include those expended for the actual equitable distribution trial

There is no reason to order that husband satisfy wife's enormous counsel fees Save the three specific instances addressed above, this Court has already addressed reimbursing wife $30 981 89 for counsel fees What is more, the only marital asset to value according to the prenuptial agreement is husband's IRA, which does not require an expert The prenuptial agreement addressed marital and non-marital property and how same was to be divided The only issues that required litigation were husband's support obligation to wife and whether the mortgage on the Dyers Stone property was to be considered a marital debt Certainly these issues needed to be fully explored Judge DiSalle held a hearing on September 24, 2010 regarding the interpretation of the support obligation clauses in the prenuptial agreement albeit the undersigned vacated his findings [36] But whether the mortgage is a marital debt should not take inordinate and extensive research and preparation for trial

The Court finds that wife's counsel fees are grossly out of proportion to the relative value and complexity of the case Moreover, and importantly, wife has a substantial source of income from which she supports herself [37] For these reasons, the Court denies additional fees

In conclusion, the Court finds that husband owes wife the following

| Type | Amount |
|---|---|
| IRA | 17 669 00 |
| Support Payments[38] | 36,754 50 |
| Life Insurance Premium Reimbursement | 11,532 59 |
| Additional Counsel Fees | 3 000 00 |
| **TOTAL** | **$68,956 09** |

---

[36] Judge DiSalle also entertained several motions regarding this issue before the September 2010 hearing In addition this matter was re-litigated and argued before the undersigned

[37] Wife testified on cross-examination that she "uses' her mother's" PNC checking account ending in '3304 to support her on a daily basis There was no testimony of how this account is titled, but wife has free access to it The Court does not find her testimony credible that her withdrawals are to be repaid to mother *See supra* note 12

[38] Support payments consist of A P L, medical insurance premium reimbursements and medical expense reimbursements

18

Husband shall make said payment within thirty days of this order Wife shall hold husband harmless regarding the mortgage on Dyers Stone Drive and the Custom Home judgments at GD-10-21463 in the Allegheny County Court of Common Pleas and CV-2011-3052 in the Washington County Court of Common Pleas Finally, husband shall sign the appropriate documents transferring ownership of the American General Life Insurance Company policy to wife within 30 days of this order

BY THE COURT

_____
Gary Gilman, Judge

_____4/12/16_____
Date

from the record

ATTEST:

_____
PROTHONOTARY
JOY SCHURY RANKO, PROTHONOTARY
My Term Expires First Monday in January, 2020

19